[No. S029707. June 7, 1999.]

In re ARMENIA LEVI CUDJO, JR., on Habeas Corpus.

**COUNSEL**

Folger & Levin, Folger, Levin & Kahn, Michael A. Kahn, Wesley D. Hurst, Katherine Livingston, Margaret E. Murray, Robert E. Stenson, Maxwell S. Peltz; Geraldine S. Russell; and J. Thomas Bowden for Petitioner.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Donald deNicola, Roy C. Preminger, Susan Lee Frierson, Marc E. Turchin and Beverly K. Falk, Deputy Attorneys General, for Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted petitioner Armenia Levi Cudjo, Jr., of the first degree murder (Pen. Code, § 187; all further statutory citations are to this code unless otherwise noted) of Amelia Prokuda. The jury found that petitioner committed this murder with the use of a deadly weapon (§ 12022, subd. (b)) and while engaged in the commission of robbery (§ 190.2, former subd. (a)(17)(i) [now subd. (a)(17)(A)]) and burglary (§ 190.2, former subd. (a)(17)(vii) [now subd. (a)(17)(G)]). The jury also convicted petitioner of one count each of robbery with the use of a deadly weapon (§§ 211, 12022, subd. (b)) and burglary of an inhabited dwelling (§§ 459, 462, subd. (a)). The jury fixed the penalty for the murder at death. The trial court denied the automatic motion to modify this penalty verdict (§ 190.4, subd. (e)), stayed the pronouncement of sentence on the noncapital counts, and sentenced petitioner to death. On petitioner's automatic appeal, this court affirmed the conviction and the sentence of death. (*People* v. *Cudjo* (1993) 6 Cal.4th 585 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

In a petition for a writ of habeas corpus, petitioner now seeks relief from the judgment. He has alleged, among other things, that the attorney appointed to represent him during the capital trial provided ineffective assistance by not adequately investigating the possibility that Amelia Prokuda's

killer was her husband, Ubaldo Prokuda, rather than petitioner. This court issued an order to show cause limited to this claim. In so doing, we made an implicit determination that petitioner had failed to state a prima facie case as to the other claims alleged in the petition. (*In re Sassounian* (1995) 9 Cal.4th 535, 547 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

After the filing of respondent's return and petitioner's traverse, we determined that there were disputed questions of fact necessitating an evidentiary hearing. We appointed as referee the Honorable Paul G. Flynn, a superior court judge, and directed him to take evidence and make findings on these questions:

"1.   What actions did petitioner's trial attorney William Clark take to investigate the potential culpability of Ubaldo Prokuda for the murder of Amelia Prokuda? What were the results of that investigation? Was that investigation conducted in a manner to be expected of a reasonably competent attorney acting as a diligent advocate? If not, in what respects was it inadequate?

"2.   If trial counsel's investigation was inadequate, what additional information would an adequate investigation have disclosed?

"3.   After conducting an adequate investigation of Ubaldo Prokuda's potential culpability, would a reasonably competent attorney acting as a diligent advocate have introduced evidence of his culpability in petitioner's defense at the guilt phase of the trial? If so, what rebuttal evidence would have been reasonably available to the prosecution?"

The referee held an evidentiary hearing on August 22, 26, 27, and 28, 1996. At this hearing, the referee received a large quantity of documentary evidence and heard the testimony of one witness, an attorney who testified for petitioner as an expert. Thereafter, the referee submitted to this court a 36-page report stating his findings and conclusions. In brief, the referee found that petitioner's trial attorney investigated the potential culpability of Ubaldo Prokuda in a manner to be expected of a reasonably competent attorney acting as a diligent advocate and that petitioner's trial attorney thereafter made a reasonable decision not to present evidence, at petitioner's trial, of the potential culpability of Ubaldo Prokuda.

After considering the record of the hearing and the referee's report, we conclude that petitioner has failed to demonstrate either that his trial attorney's performance was deficient under applicable standards or that there is any substantial, credible evidence that Ubaldo Prokuda murdered his wife.

Accordingly, petitioner's claim of ineffective assistance of trial counsel is lacking in merit, and we shall deny his petition for a writ of habeas corpus.

## I.  THE TRIAL EVIDENCE

The evidence supporting petitioner's conviction and sentence has been set forth in *People* v. *Cudjo, supra,* 6 Cal.4th 585, and is summarized here.

### A.  *The Prosecution's Evidence*

During the afternoon of March 21, 1986, sheriff's deputies found the body of Amelia Prokuda in the master bedroom of her home. The body was facedown on the floor, with the wrists tied together behind the victim's back, the ankles tied together, and the wrists tied to the ankles. These bindings were made with neckties belonging to the victim's husband, Ubaldo Prokuda.

The body was clothed only in a robe. On the floor near the body were the victim's underwear, socks, and running shoes, as well as a bloodstained hammer and the broken tip of a fireplace poker. The cause of death was multiple blows to the back and sides of the head, fracturing the skull and lacerating the brain. Semen was present on the victim's right inner thigh and genital area, but there was no indication of traumatic sexual assault. Based on liver temperature, death was estimated to have occurred between 8:10 a.m. and 12:30 p.m. that day.[1] The victim's blood tested negative for illegal drugs, including cocaine.

Kevin Prokuda, the youngest of the victim's sons, was five years old on the day of Amelia Prokuda's death and seven years old when he testified at trial. According to his testimony, a man Kevin had never seen before entered the house before lunch, as Kevin was under a table in the living room watching television. This man, who was wearing a sleeveless blue top and dark blue cutoff pants, put a knife to Amelia Prokuda's neck and demanded money. Kevin described the knife as a black survival knife with a "little round silver ball around it." At the man's direction, Kevin brought him the keys to the family van. After unsuccessfully trying to start the van, the man took Amelia Prokuda to the master bedroom and tied her up. From the closet

---

[1]This estimate of the time of death differs somewhat from the estimate given during the initial investigation and contained in police reports furnished to petitioner's trial attorney, William Clark. The initial estimate put the time of death between 10:00 a.m. and 11:00 a.m. The two estimates concur in fixing 10:30 a.m. as the most likely time of death. The initial estimate, using a one-hour time period, appears to identify the *probable* time of death. The more cautious trial estimate, using a period exceeding four hours, appears to identify the *possible* time of death.

in the master bedroom, the man removed two guns belonging to Kevin's father. Kevin went into his own bedroom and stayed there for a long time. Some days later, Kevin attended a lineup but did not identify anyone.

Ubaldo Prokuda testified that he had left the house that morning between midnight and 1:00 a.m. to go to work 77 miles away in the City of Commerce. When he returned around 5:00 p.m., the sheriff's deputies were already there. Missing from the house were an M-1 carbine, a 30.06 rifle, and an Army duffel bag. Amelia Prokuda's jewelry case, usually kept in the bedroom, was in the family van. The hammer found on the bedroom floor was normally kept in a toolbox in the garage. The fireplace poker was in its usual place, but there were bloodstains on the shaft and the tip had been broken off. He had no reason to suspect that Amelia Prokuda had been using illegal drugs.

Investigating officers found the keys to the van outside, near the rear garage door. In the same area, the officers found a single set of shoe prints leading away from the house and continuing for about a third of a mile to the vicinity of a camper from which Amelia Prokuda's house was easily visible. Petitioner and his brother Gregory emerged from the camper and were taken into custody.

Inside the camper, the officers found a pair of MacGregor athletic shoes that could have made the prints. The officers found an identical pair of shoes in an automobile belonging to petitioner's mother, Maxine Cudjo; these shoes were "very wet."

In addition to the shoes, the officers found a black survival knife and a pair of cutoff blue jeans in the camper. When shown these articles at trial, Kevin testified that the knife was different from the knife wielded by the man who had assaulted his mother, and that the cutoff pants the assailant had worn were similar to, but shorter than, the ones found in the camper.

Maxine Cudjo testified that on the day of the murder she was living in the camper. Petitioner and Gregory had slept in the camper the previous night. She spent most of that morning in the house next door, returning to the camper at 11:00 a.m. She found petitioner and Gregory inside. The three of them went in her car to the post office and then to the residence of Julia Watson, her daughter. The three then returned to the camper, but Maxine departed again around 1:30 p.m., leaving petitioner and Gregory in the camper. She next returned to the camper around 4:00 p.m., after sheriff's deputies had taken her sons into custody.

The prosecution evidence at trial included testimony Gregory Cudjo had given at petitioner's preliminary hearing and statements Gregory Cudjo had

made to investigating officers during a tape-recorded interview. On both occasions, Gregory maintained that he had stayed in the camper throughout the morning of the murder until his mother returned around 11:00 a.m. During this time, he alternately slept and listened to a baseball game on the radio. He said petitioner was away from the camper roughly two hours, leaving around the time the baseball game started and returning at the same time as Maxine. During the taped interview, Gregory said that petitioner had later washed off his athletic shoes at Julia Watson's house.

Analysis of semen found on the victim's external genital area and right inner thigh revealed that it could have come from petitioner but not from either Gregory Cudjo or Ubaldo Prokuda.

### B. *Petitioner's Testimony*

Petitioner testified in his own behalf. He admitted that he knew Amelia Prokuda and that he had had sexual relations with her on the morning of her death, but he denied that he had killed her. He claimed to have seen Amelia Prokuda on three occasions before the day of her death. According to petitioner, he saw her purchase cocaine on two of these occasions, and on the third he had seen her at a market and they had waved to each other.

Regarding the day of the murder, petitioner testified that he was driving his mother's car to a friend's house around 9:00 a.m. when he noticed Amelia Prokuda standing in the front yard of her residence. She came to the car and asked petitioner if he knew anybody who had any cocaine. Petitioner said he had some. She asked if she could have it on credit as a favor. He said that it would depend on whether she would do him a favor. They agreed to talk about it further.

Petitioner testified that he then drove to the camper, retrieved some cocaine, and returned to Amelia Prokuda's residence. She invited him into the house. He sold her some cocaine on credit for $50. After further conversation, Amelia Prokuda agreed to have sex with petitioner in lieu of cash payment. They engaged in sexual intercourse on the living room couch, and petitioner left five minutes later. He returned to the camper and told Gregory he had had sex with Amelia Prokuda in exchange for cocaine. Petitioner then went jogging. When he returned to the camper, Gregory was there and their mother arrived about five minutes later.

### C. *Other Defense Evidence*

To establish Gregory's knowledge of the details of the murder, the defense introduced the complete tape recordings of Gregory's two interviews

with investigating officers. During these interviews, Gregory said that when petitioner saw the officers following the shoe tracks to the camper, he admitted to Gregory that it appeared the officers were following his (i.e., petitioner's) tracks.

According to Gregory, petitioner gave this description of what he had done: Petitioner had hidden and the woman had walked up with a basket of clothes. The woman was wearing a housecoat, which came open. Petitioner rushed up, grabbed her, put a knife to her throat, and said he wanted only money. The woman had no money and no jewelry, but petitioner took a couple of shotguns, one of which looked like a rifle. The woman started to make a lot of noise, so petitioner put a sock in her mouth. There was a little boy, and there was a boa constrictor in an aquarium. (Kevin kept a pet snake in his bedroom.) The little boy had shown petitioner where to find the keys to a van. Petitioner had started the van but was unable to drive it out of the garage because the garage door was padlocked on the outside. Petitioner had "hog-tied" the woman with some neckties that were in the closet "next to a . . . jacket with all kinds of medals on it—something like a Ranger jacket or something." (Ubaldo Prokuda testified he had been an Airborne Ranger in the United States Army, and his green full-dress uniform had been hanging in the closet.) Petitioner became "real nervous" because the woman had said her husband would come home at noon and it was then 11:25 a.m. He had tied her up to give himself enough time to get away. He did not rape the woman. According to Gregory, petitioner said nothing about hitting the woman.

By stipulation, the defense established, first, that Kevin had told investigating officers on the day of the murder that he had been watching *I Dream of Jeannie* on television when the intruder entered his house; second, that this program had been broadcast that day from 10:30 a.m. to 11:00 a.m.; and, third, that the professional baseball game that was broadcast that morning began at 10:30 a.m.

### D. *Penalty Phase Evidence*

The prosecution presented no evidence at the penalty phase. The only defense evidence as to penalty was the testimony of petitioner, who again denied killing Amelia Prokuda.

## II. THE EVIDENCE AT THE REFERENCE HEARING

After being appointed to represent petitioner at trial, William Clark received a packet of discovery materials from the prosecution. This packet

contained reports of two witness statements suggesting the possibility that Ubaldo Prokuda had murdered Amelia Prokuda.

At 8:00 p.m. on the day of the murder, a sheriff's investigator had interviewed Alander Wilson, a self-employed construction contractor, who said he had been working on the residence across the street from the one in which Amelia Prokuda was murdered. He had returned from lunch around 1:30 p.m.; thereafter, a boy he knew as Kevin approached him and "told him that his daddy had just killed his mom" and that "his mom had bought his daddy two new guns and that his daddy had put them in the garage."

Investigators also interviewed Lora Johnson, who lived near Amelia Prokuda and described herself as a "close friend" of Amelia Prokuda. According to the investigators' report, Johnson said that when she left her own residence "around noon" she had "noticed that the victim's husband's car was in the driveway of the location." At that time, "the drapes in the living room [of Amelia Prokuda's house] were open, as were the drapes in the back, allowing her to see through the house to the rear yard," but "she did not see any people moving about the property." Johnson told investigators that when she returned home around 1:05 p.m., "she noticed that the car that was previously in the driveway of the location was gone and the drapes were closed." Johnson said this was "unusual because the victim never closed her drapes during the day." She also said, however, that there were "no obvious marital problems involving the victim's family."

The packet of discovery materials also contained considerable evidence casting doubt on the hypothesis that Ubaldo Prokuda was the killer.

When interviewed by investigators at 2:25 a.m. on the day after the murder, petitioner's brother, Gregory, gave the statements that the defense introduced in evidence at petitioner's trial, in which he recounted petitioner's admissions that he had entered Amelia Prokuda's house, tied her with her husband's neckties, and taken two guns that he buried in the desert.

When interviewed by investigators, Kevin apparently said nothing about his father having killed his mother. Instead, his statement was generally consistent with the testimony he gave at trial. He said his mother had been seized by a knife-wielding intruder when she opened a door leading from the house to the garage. The intruder demanded money. Kevin mentioned guns to the investigators, saying that "they were normally kept in the closet in the victim's bedroom" and that "he had seen the guns on the floor of the victim's bedroom next to the victim." Kevin said he saw the intruder tie up his mother. The intruder then sent Kevin to his room. "Later, when he came

out of his room, [Kevin] saw that his mother was still tied up and that she had red stuff all over her head."

Kevin told the investigators that he had been watching *I Dream of Jeannie* on television when the intruder appeared. This television show aired between 10:30 a.m. and 11:00 a.m. Based on the victim's liver temperature, the coroner's investigator estimated that she had died between 10:00 a.m. and 11:00 a.m., approximately. (See fn. 1, *ante*.)

The packet of discovery materials also contained reports describing how the sheriff's investigators had found the shoe tracks leading from Amelia Prokuda's residence to the camper where petitioner and Gregory were found and detained.

Regarding Ubaldo Prokuda's potential culpability for his wife's murder, the packet included a number of significant reports. When interviewed by investigators at 10:45 p.m., Ubaldo Prokuda said he had left his house for work around 1:40 a.m. He left work around 11:00 a.m. On the way home, he stopped at a bank in the City of Commerce or Bell Gardens, bought gasoline and oil at a service station near the bank, and bought stamps at a post office in Bell Gardens. Around noon he visited a bar in Bell Gardens called Mary's Place, where he had two drinks and spoke with a barmaid known to him as "Buttons." He then stopped at a nursery to discuss trees and plants for his yard. His final stop was at the Sandpiper Bar where he had one more drink and spoke with a barmaid named Bobbie. He arrived home around 3:30 p.m. to find the police already there. He denied killing his wife and affirmed that he owned two rifles that were normally kept in the master bedroom closet but were then missing.

Other reports documented sheriff's investigators' efforts to verify Ubaldo Prokuda's statements. Ubaldo Prokuda's supervisor told an investigator that Ubaldo had "clocked out at 1048 hours." Nancy Austen, who worked with Ubaldo Prokuda, said she had spoken to him at the office around 11:00 a.m. She also said that the employee parking lot was 10 minutes from the office. At a bar called Marie's in Bell Gardens, Neva Marvich said Ubaldo Prokuda had been there between 11:00 a.m. and 1:00 p.m. and had consumed two drinks and "played some pool."

The discovery materials also included a report of a jail incident on March 26, 1986, five days after the murder. While a jailer, Deputy Merritt, was in the process of sending prisoners to a holding cell to go to court, a prisoner named Lewis complained about being in jail for a crime he had not committed. In response, "suspect Cudjo" said "I'm in here for murder, and I did

it." To determine the identity of "suspect Cudjo," petitioner's trial counsel, William Clark, questioned Deputy Merritt about this incident, but Merritt was unsure whether petitioner or Gregory had made the statement.

To determine whether Ubaldo Prokuda could have killed Amelia Prokuda, a licensed private investigator and former deputy sheriff, acting at Clark's direction, "made timed car trips between [Ubaldo Prokuda's place of employment and the residence where Amelia Prokuda was murdered] and he concluded that [Ubaldo Prokuda] could not have been present at his residence until nearly three or more hours after the time the Coroner's Office indicated the murder had occurred."

In a declaration, Clark explained that when he first interviewed petitioner, petitioner "denied any contact with murder victim [Amelia Prokuda] and denied ever having been at her residence for any reason." Petitioner told Clark that Gregory "must have committed the murder." Petitioner did not alter these statements until "the eve of trial," after test results had revealed that semen found on Amelia Prokuda could have come from petitioner but not from either Gregory or Ubaldo Prokuda. Petitioner then admitted having intercourse with Amelia Prokuda, giving Clark an account consistent with petitioner's trial testimony.

Clark decided not to attempt at trial to establish that Ubaldo Prokuda had murdered Amelia Prokuda because, in Clark's words, "there was no credible evidence that [Ubaldo Prokuda] could have been present at the time of the murder," and because "a theory that [Ubaldo Prokuda] had killed his wife would have detracted from the defense which was presented at the trial."

Clark declared that he had wanted to interview Alander Wilson but had been unable to locate him, despite searching in DMV (Department of Motor Vehicles) and CII (Bureau of Criminal Investigation and Identification) records and by informal inquiries.

Edward Rucker, an attorney in private practice and a former deputy public defender, testified as an expert witness for the defense. He had represented 25 to 30 defendants who had faced capital charges at some stage of the proceedings, and had represented 7 or 8 defendants at jury trials in which the prosecution was seeking the death penalty. He had reviewed the trial file of petitioner's trial attorney, William Clark, the transcripts of petitioner's trial, and the stipulations entered at the reference hearing. Based on this review, he testified to these opinions: Clark's investigation of the potential culpability of Ubaldo Prokuda was inadequate because a reasonably competent attorney acting as a diligent advocate would have interviewed Alander

Wilson and Amelia Prokuda's neighbors, at least attempted to interview Kevin, and promptly and thoroughly investigated Ubaldo Prokuda's alibi; an adequate investigation would have yielded evidence supportive of the defense that Ubaldo Prokuda was the killer; and a reasonably competent attorney would have presented that evidence and argued that defense at petitioner's trial.

### III. GOVERNING LEGAL PRINCIPLES

#### A. *Burden of Proof*

■ "A habeas corpus petitioner bears the burden of establishing that the judgment under which he or she is restrained is invalid. [Citation.] To do so, he or she must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus. [Citation.]" (*In re Visciotti* (1996) 14 Cal.4th 325, 351 [58 Cal.Rptr.2d 801, 926 P.2d 987].)

#### B. *Ineffective Assistance of Counsel*

■ "When the basis of a challenge to the validity of a judgment is constitutionally ineffective assistance by trial counsel, the petitioner must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations]; or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. (*Strickland* v. *Washington* [(1984)] 466 U.S. [668,] 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d at pp. 697-698]; [citations].) In demonstrating prejudice, however, the petitioner must establish that as a result of counsel's failures the trial was unreliable or fundamentally unfair. [Citation.] 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' (*Strickland* v. *Washington, supra,* 466 U.S. at p. 686 [104 S.Ct. at pp. 2067-2068, 80 L.Ed.2d at pp. 692-693].)" (*In re Visciotti, supra,* 14 Cal.4th 325, 351-352.)

#### C. *Standard of Review*

■ In a proceeding on a petition for a writ of habeas corpus, this court independently reviews a referee's resolution of legal issues and mixed

questions of law and fact. (*In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299].) Because the referee observes the demeanor of testifying witnesses, and thus has an advantage in assessing their credibility, this court ordinarily gives great weight to the referee's findings on factual questions, but this deference is arguably inappropriate when the referee's factual findings are based entirely on documentary evidence. (*In re Avena* (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

Here, the only witness at the reference hearing testified as an expert, not as a percipient witness. Because observing the demeanor of an expert is generally of little or no benefit in evaluating the persuasive value of the expert's opinion testimony, deference to the referee's factual findings may not be appropriate. Accordingly, we will independently review the evidence presented at the hearing to determine whether it supports the referee's findings and conclusions.

## IV. The Referee's Report and Petitioner's Exceptions

### A. *The Actions Clark Took to Investigate Ubaldo Prokuda's Potential Culpability*

The referee found that after reviewing the investigators' reports provided by the prosecution, petitioner's trial counsel, William Clark, took two actions to investigate Ubaldo Prokuda's potential culpability for the murder of Amelia Prokuda: He attempted unsuccessfully to contact and interview Alander Wilson, and he had his investigator make timed drives from Ubaldo Prokuda's place of employment to the murder scene.

Petitioner excepts to these findings only insofar as they characterize Clark's review of the prosecution's reports and his unsuccessful attempt to contact and interview Alander Wilson as actions taken to investigate Ubaldo Prokuda's potential culpability. We find the complaint to be without substance. However one chooses to characterize these actions—as actual investigation, attempted investigation, or preparation for investigation—they are all relevant to an evaluation of petitioner's claim that Clark provided ineffective assistance by not adequately investigating Ubaldo Prokuda's potential culpability for the murder of Amelia Prokuda. Accordingly, we adopt the referee's findings that Clark did review the prosecution's reports, attempt to contact and interview Alander Wilson, and direct his investigator to make timed drives from Ubaldo Prokuda's place of employment to the murder scene.

### B. *The Results of This Investigation*

The referee found that as a result of this investigation, petitioner's trial counsel, William Clark, determined from his investigator that Ubaldo

Prokuda "could not have arrived at the murder scene until three or more hours after the 10 a.m. to 11 a.m. time of death estimated by the coroner's office." The referee found that, after unsuccessfully attempting to contact Alander Wilson, Clark "concluded that the evidence tended to rule out the possibility that Ubaldo Prokuda was a viable suspect, because he could not have been present at the scene of the murder"; Clark concluded also that "presenting a defense pointing to Ubaldo Prokuda as the real murderer would have detracted from, and been inconsistent with, the defense that petitioner's brother Gregory . . . committed the crime."

Excepting to these findings, petitioner argues that Clark could not reasonably draw any conclusions based on his investigator's timed drives between Ubaldo Prokuda's workplace and the murder scene because those timed drives were "poorly performed." Petitioner further argues that Clark's investigation was insufficient to permit any conclusion regarding Ubaldo Prokuda's potential culpability or about the viability of a defense based on that potential culpability. Because these arguments are actually addressed to whether the investigation was reasonable in scope and competently performed (that is, whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms), and not to identifying the results of the investigation, we defer consideration of petitioner's arguments until we address those issues.

We find that the results of Clark's investigation of Ubaldo Prokuda's potential culpability were these: (1) by reading the investigator's reports provided by the prosecution, Clark acquired knowledge of the information contained in those reports; (2) Clark acquired no relevant information by his unsuccessful attempts to contact and interview Alander Wilson; and (3) by instructing his investigator to make timed drives from Ubaldo's workplace to the murder scene, Clark learned that the timed drives had caused his investigator, who was apparently well qualified and experienced in these matters, to conclude that Ubaldo Prokuda could not have reached the murder scene until hours after the 10:00 a.m. to 11:00 a.m. time of death estimated by the coroner's investigator.

C. *Evaluation of the Investigation*

Regarding the adequacy of Attorney Clark's investigation of Ubaldo Prokuda's potential culpability (that is, whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms), the referee made these findings and conclusions: "[T]rial counsel acted within the bounds of reasonable competence when he limited his investigation of Ubaldo Prokuda to a consideration of the prior investigative

reports and testing the timing of the drive between Ubaldo's place of employment and the crime scene. Based upon the information known to counsel prior to trial, he exercised reasonable professional judgment in concluding that any additional investigation of Ubaldo Prokuda's culpability would not only be inconsistent with what he assessed to be the best defense, but also would be fruitless, given the alibi evidence discovered by law enforcement investigators. Moreover, he reasonably feared the loss of defense credibility if both Ubaldo Prokuda and Gregory Cudjo, a substantially stronger suspect, were presented as alternative possible perpetrators."

Excepting to these findings, petitioner argues that Clark's investigation of Ubaldo Prokuda's potential culpability was both incompetently performed and unreasonably limited in scope. We explain why these objections are not well taken and why we conclude that counsel's performance did not fall below an objective standard of reasonableness under prevailing professional norms.

### 1. *Competence of the investigation actually performed*

Petitioner challenges Clark's statement in his declaration that he had wanted to interview Alander Wilson but was unable to locate him despite searching DMV and CII records and making informal inquiries. Noting that Alander Wilson's correct address was given in the investigative reports furnished to Clark, petitioner asserts that Clark either failed to read the reports carefully or was not being truthful when he stated that he wanted to interview Wilson. Under the circumstances presented here, we decline to find either that Clark negligently failed to notice that the reports contained an address for Wilson or that Clark was untruthful in stating that he had attempted in good faith to locate and interview Wilson. Petitioner did not call Clark as a witness at the reference hearing and inquire into this matter further, nor did petitioner introduce any evidence directly contradicting the statements in Clark's declaration. We do not regard Clark's statements on this point as inherently improbable. For any number of reasons, Clark or his investigator, after noting that the prosecution's reports contained an address for Wilson, could have reasonably but erroneously concluded that Wilson was not living at that address. For example, the investigator may have gone to the address, found no one at home, and received false information from a neighbor that Wilson had moved or had never lived there.

Petitioner insists that Clark could not reasonably draw any conclusions based on his investigator's timed drives between Ubaldo Prokuda's workplace and the murder scene because those timed drives were "poorly performed." In support of this assertion, he notes that no evidence was introduced at the reference hearing to establish that the investigator attempted to

find the quickest route or that he drove more than one route. He notes also that the distance between Ubaldo Prokuda's workplace and the murder scene is 77 miles and that investigators for petitioner's habeas corpus counsel and for the state determined that the route could be driven in 1 hour and 20 minutes to 1 hour and 30 minutes,[2] which petitioner contrasts with what he asserts was the approximately 3 hours that Clark's investigator required to drive the same distance.

Petitioner's reasoning falsely assumes that Clark's investigator required three hours to complete the seventy-seven-mile drive, without stops. This is not what Clark stated in his declaration. Rather, Clark stated that his investigator "made timed car trips between [Ubaldo Prokuda's place of employment and the residence where Amelia Prokuda was murdered] and he concluded that [Ubaldo Prokuda] could not have been present at his residence until nearly three or more hours after the time the Coroner's Office indicated the murder had occurred." Clark did not state in the declaration whether the investigator made stops during the timed drives, how long it took the investigator to complete the drives, or what assumptions figured in the investigator's conclusion that Ubaldo Prokuda "could not have been present at his residence until nearly three or more hours after the time the Coroner's Office indicated the murder had occurred." Because the coroner's investigator estimated that the victim died between 10:00 a.m. and 11:00 a.m., the investigator may reasonably have placed the time of death at 10:30 a.m. Because sheriff's investigators had received information that Ubaldo Prokuda had clocked out at 10:48 a.m., that he had spoken to a fellow employee before leaving the office, and that the employee parking lot was a 10-minute walk from the office, the investigator may have reasonably assumed that Ubaldo Prokuda did not begin the drive home until 11:10 a.m. or 11:15 a.m. Because sheriff's investigators had confirmed that Ubaldo Prokuda had stopped at a bar, where he had two drinks and played pool, the investigator may reasonably have assumed that Ubaldo Prokuda made at least one stop en route of at least an hour in duration. Given these reasonable assumptions, the investigator could plausibly have concluded that, allowing one hour and thirty minutes of actual driving time, Ubaldo Prokuda could not have arrived at the murder scene before 1:45 p.m., which would have

---

[2]At the reference hearing, the parties stipulated that, if called as a witness, an investigator for the state would testify that he drove from Ubaldo Prokuda's workplace to the murder scene in 1 hour and 28 minutes by a route that was 85 miles in length. The parties also stipulated that, if called as a witness, an investigator for petitioner (Lawrence DeLosh) would testify that he drove between the same 2 points, with stops at a bank, a nursery, a post office, and a bar, in 1 hour and 57 minutes by a route that was 77 miles in length. Finally, the parties stipulated that a third individual (Steve Strong) made 2 trips between the same 2 points, without stopping, using different routes, one being 73 miles and the other 89.4 miles, in 1 hour and 30 minutes and 1 hour and 20 minutes, respectively.

been more than three hours after the 10:30 a.m. time of death estimated by the coroner's investigator.

In any event, the issue we consider is the quality of service provided by petitioner's attorney, William Clark, not the quality of service provided by his investigator, Walter Hill. Hill was duly licensed as a private investigator and had served as a deputy sheriff for the County of Los Angeles for 27 years. Nothing in the record establishes that Clark had any reason to question Hill's competence as an investigator or to question his professional opinion, based on his timed drives, that Ubaldo Prokuda could not have arrived at the murder scene until hours after the time of death estimated by the coroner's investigator.

Accordingly, we conclude that as regards the investigation actually conducted, petitioner has not demonstrated that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

### 2. The decision to close the investigation of Ubaldo Prokuda's culpability

Petitioner challenges the referee's finding that Clark acted reasonably and competently in deciding not to conduct further investigation of Ubaldo Prokuda's potential culpability for the murder of Amelia Prokuda. He argues that there were many other avenues of investigation that Clark could have pursued and that there was no sound tactical reason not to do so.

The United States Supreme Court has formulated the governing legal standard this way: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 690-691 [104 S.Ct. 2052, 2066, 80 L.Ed.2d 674].)

Here, we agree with petitioner that Clark's investigation of Ubaldo Prokuda's potential culpability was "less than complete" in the sense that there were other steps Clark *could* have taken. For example, he could have

interviewed Lora Johnson or other neighbors to determine whether they had in fact seen Ubaldo Prokuda's car at the murder scene around noon on the day of the crime; he could have interviewed the barmaid, Neva Marvich, who reportedly said that Ubaldo Prokuda was in a bar in Bell Gardens, more than 60 miles from the murder scene, around noon on the day of the crime; and he could have investigated Ubaldo Prokuda's background to determine whether he had a history of violence.

To say that Clark *could* have taken other investigative steps is not to say that he *should* have taken them. Rather, to determine whether Clark performed an adequate investigation of Ubaldo Prokuda's potential culpability, we evaluate his decision not to investigate further "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 691 [104 S.Ct. 2052, 2066].) The referee made this same evaluation and concluded that Clark's decision to discontinue the investigation was reasonable for these reasons: (1) The evidence supporting Ubaldo Prokuda's alibi was virtually overwhelming and not subject to meaningful attack; (2) the evidence accumulated during the law enforcement investigation overwhelmingly pointed to either petitioner or Gregory as the killer; (3) Ubaldo Prokuda's guilt would not explain Gregory's statement implicating petitioner; (4) information that trial counsel obtained from sources other than law enforcement pointed to the culpability of petitioner or Gregory, not Ubaldo Prokuda; and (5) a reasonably competent attorney could have concluded that the statements of Alander Wilson and Lora Johnson did not warrant further investigation. Petitioner challenges each of these reasons; we consider them in turn.

a. *Evidence supporting Ubaldo Prokuda's alibi virtually eliminated him as a suspect*

We agree with the referee's conclusion that information gathered by the law enforcement investigation, and disclosed to petitioner's attorney, William Clark, virtually eliminated Ubaldo Prokuda as a suspect in his wife's murder. As already mentioned, the coroner's investigator used the temperature of Amelia Prokuda's liver, taken at 6:00 p.m., to estimate that her death had occurred between 10:00 a.m. and 11:00 a.m. Sheriff's investigators determined that Ubaldo Prokuda had "clocked out" at his workplace in the City of Commerce at 10:48 a.m., that two fellow employees reported having spoken to him around 11:00 a.m., and that the employee parking lot was a ten-minute walk from the office. When interviewed by sheriff's investigators, Ubaldo Prokuda said that after leaving his workplace, and before returning home, he stopped at a bank, a service station, a plant nursery, and two bars. If true, Ubaldo Prokuda's statement established that he had, in the

referee's words, "a virtually ironclad alibi." Four days after the murder, a sheriff's homicide investigator had checked Ubaldo Prokuda's statement by interviewing Neva Marvich at a bar called Marie's. Marvich reportedly told the investigator that on the day of the murder Ubaldo Prokuda had arrived at Marie's between 11:00 a.m. and 1:00 p.m. and that he "had 2 screwdrivers" and "played some pool." She also reportedly said that she "only sees [Ubaldo Prokuda] on Friday" (the murder occurred on a Friday), and that she "had not seen him since."

Petitioner does not dispute that this evidence, on its face, virtually eliminated Ubaldo Prokuda as a suspect in his wife's murder, but he argues that his trial attorney, William Clark, should not have relied on the results of the law enforcement investigation without independent verification of key facts. But there is no fixed rule requiring counsel to confirm all key facts stated in law enforcement investigation reports. Petitioner relies on a decision, *In re Hall* (1981) 30 Cal.3d 408 [179 Cal.Rptr. 223, 637 P.2d 690], in which we criticized defense counsel's reliance on law enforcement investigation because "many of the witnesses were part of a community openly suspicious of and hostile toward representatives of law enforcement." (*Id.* at pp. 425-426.) We emphasized the importance of examining all the circumstances to determine whether counsel had acted reasonably. (*Ibid.*)

Here, none of the key facts establishing Ubaldo Prokuda's alibi—that is, the probable time of death, the time when Ubaldo Prokuda left work, and the time required to drive from his workplace to the murder scene—depended on statements by persons who were likely to be suspicious of and hostile toward law enforcement. A coroner's investigator provided the time-of-death estimate, a time card showed when Ubaldo Prokuda left work, two of his fellow employees verified the time-card information, and petitioner's own investigator verified the driving time between Ubaldo Prokuda's workplace and the murder scene. Absent some concrete reason to doubt the reliability of this information—and petitioner has not demonstrated that any such reason existed—trial counsel could reasonably accept it as accurate.

   b.  *Law enforcement evidence pointed to either petitioner or Gregory*

■   Shortly after the discovery of Amelia Prokuda's body, investigating officers interviewed her son Kevin. According to their reports, Kevin said nothing that in any way implicated his father in the murder. Instead, he gave a highly detailed account in which an intruder who physically resembled petitioner and Gregory Cudjo (but not Ubaldo Prokuda) accosted Amelia Prokuda as she opened the door leading to the garage. According to the

reports of Kevin's statement, the intruder grabbed Amelia Prokuda, put a knife to her throat, and demanded money. Kevin mentioned the guns that his father kept in the closet, apparently meaning that the intruder had taken them. Kevin gave the officers a description of the intruder, the clothing he had been wearing, and the knife he had used.

The officers then discovered shoe tracks leading from the yard of the residence where Amelia Prokuda's body was found to the vicinity of a camper occupied by petitioner and Gregory. Parallel to the shoe tracks the officers observed scratches as though the person who made the tracks had occasionally dragged an object such as a rifle. Clothing and a knife generally matching Kevin's descriptions were found in the camper. A pair of shoes that could have made the tracks was found in the camper, and a virtually identical pair was found, soaking wet, in an automobile belonging to petitioner and Gregory's mother.

Later that night, investigating officers again interviewed Kevin. He gave a more complete description of the incident, stating that he had been watching *I Dream of Jeannie* when the intruder first appeared; that he saw the intruder take Amelia Prokuda to the master bedroom and tie her hand and foot with neckties; that the intruder sent Kevin to his room; and that when he came out of his room sometime later, Kevin saw that Amelia Prokuda had "red stuff all over her head." When shown the knife seized from the Cudjo camper, Kevin said it was the kind of knife the intruder had used.

When investigating officers interviewed Gregory Cudjo that same night, he described an incident like the one Kevin had described. Gregory said he was repeating what petitioner had told him as they watched officers following the shoe tracks to their camper. Gregory's account included details indicating familiarity with the inside of Amelia Prokuda's residence. For example, he mentioned the presence of a pet snake in Kevin's bedroom, and a "ranger" jacket with "all kinds of medals on it" in the closet of the master bedroom.

Petitioner seeks to discount this evidence by noting that Kevin did not tell the officers that he saw the intruder kill Amelia Prokuda, and Gregory did not say anything about petitioner striking or harming Amelia Prokuda. Thus, petitioner argues, his trial attorney, William Clark, should have considered the possibility that either petitioner or Gregory had robbed Amelia Prokuda and left her tied up but alive, after which Ubaldo Prokuda had returned home, murdered Amelia Prokuda, and then abruptly departed again. This hypothetical sequence of events presents several difficulties, however. The intruder would have an obvious motive to kill Amelia Prokuda—to prevent

her from identifying him in a prosecution for residential robbery—but petitioner suggests no equally plausible motive for Ubaldo Prokuda to kill his wife in the hypothetical scenario. Also, Kevin said nothing to the officers about his father's being present, and it seems unlikely that Ubaldo Prokuda could have arrived, committed the murder, and left again without Kevin becoming aware of his presence. Perhaps most tellingly, this theory is irreconcilable with the report of Deputy Merritt, who stated that five days after Amelia Prokuda's murder he heard "suspect Cudjo"—who may have been either petitioner or Gregory—say that he was in custody for a murder and he was guilty of that murder. Accordingly, we agree with the referee that the evidence accumulated during the law enforcement investigation strongly implicated either petitioner or Gregory as the murderer.

### c. *The statements of Wilson and Johnson lacked credibility*

■ The referee found that a reasonably competent attorney, aware that the evidence accumulated during the law enforcement investigation strongly implicated either petitioner or Gregory as the murderer and tended to eliminate Ubaldo Prokuda as a viable suspect for the murder, could have concluded that the statements of Alander Wilson and Lora Johnson, as reported in the investigating officers' reports, were not sufficiently credible to warrant further investigation of the possible culpability of Ubaldo Prokuda.

As the referee noted in his report, Clark could reasonably have inferred that Wilson either misunderstood or misremembered what Kevin told him. Wilson told investigators that Kevin said "his mom had bought his daddy two new guns and that his daddy had put them in the garage." Yet Kevin's statement to the investigators, confirmed by Ubaldo Prokuda, was that the guns were normally kept in the closet of the master bedroom, not the garage. Kevin showed the investigating officers an empty rifle scabbard on the garage floor, apparently indicating that the intruder had brought the rifle into the garage. The record contains no corroboration of the claim that Amelia Prokuda had purchased the guns for Ubaldo Prokuda, or that they were new. If Wilson misunderstood what Kevin told him about the guns, he may also have misunderstood what Kevin told him about the killing. Kevin might have said, for example, "Mom's dead, he killed my mom," "Daddy's gone and he [meaning the unidentified intruder] killed my mom," or "He took Daddy's guns and killed my mom." Kevin's excitement and emotional distress may have made his words difficult to understand, and Wilson may have erroneously thought Kevin had said "my daddy killed my mom."

Regarding Lora Johnson's statement that she saw Ubaldo Prokuda's car at the residence around noon on the day of the murder, the referee observed

that she may well have misremembered the day on which she made this observation, attributing to the day of the murder an observation she had had actually made one or more days earlier. This seems all the more likely because the investigating officers' reports stated that they had interviewed four other neighbors, yet there is no mention of any of these other neighbors claiming to have seen Ubaldo Prokuda's car. Nor did the reports mention any such sighting having been related by Alander Wilson, although he said he had been working across the street until he left for lunch at 1:00 p.m.

The referee concluded that petitioner's trial counsel, William Clark, could reasonably have focused on a different part of Lora Johnson's reported statements to sheriff's investigators. Johnson reportedly said she was a close friend of Amelia Prokuda and that there were "no obvious marital problems involving the victim's family." This statement tended to eliminate any motive for Ubaldo Prokuda to kill Amelia Prokuda, thus suggesting to competent counsel that any further investigation of Ubaldo Prokuda's potential culpability would be fruitless.

### d. *Other evidence pointed to Gregory*

From sources other than law enforcement, petitioner's trial attorney, William Clark, had received information pointing to the culpability of Gregory Cudjo for the murder of Amelia Prokuda. Petitioner's investigator had interviewed John Culver, who was then in jail. Culver reportedly told the defense investigator that he had known the Cudjo brothers for 25 years, and that in March 1986, while he and Gregory were sharing a cell, Gregory had admitted burglarizing a house to obtain money and jewelry. Gregory reportedly told Culver that the woman who lived there had recognized him because they had previously smoked cocaine together, and that he had struck her repeatedly with a hammer to make her stop screaming.

### e. *Ubaldo Prokuda's guilt was irreconcilable with Gregory's statements*

The referee concluded that "there would be no logical explanation as to why Gregory Cudjo implicated petitioner" if Amelia Prokuda's killer was neither petitioner nor Gregory, but Ubaldo Prokuda. If the killer was Gregory, "then he would have had a motive to falsely implicate petitioner in order to hide his own culpability." But "there would have been no explanation counsel could have given the jury as to why Gregory would implicate petitioner."

We find the referee's point to be valid but overstated. Gregory's statements implicated petitioner in a residential robbery, but Gregory never stated

that petitioner physically harmed Amelia Prokuda. Therefore, at least in theory, counsel could have conceded that either petitioner or Gregory robbed Amelia Prokuda and left her bound but alive, and that Ubaldo Prokuda found her in this condition and killed her. Gregory's statements were not logically irreconcilable with Ubaldo Prokuda's guilt; for the reasons already stated, however, it would have been difficult and perhaps impossible to reconcile them in a way that would be sufficiently plausible to provide an effective defense.

For the reasons noted by the referee—the virtually overwhelming evidence supporting Ubaldo Prokuda's alibi, the strength of the prosecution's evidence pointing to either petitioner or his brother Gregory as the killer, the information trial counsel obtained from a source other than law enforcement pointing to Gregory as the killer, and the reasons for questioning the reported statements of Alander Wilson and Lora Johnson implicating Ubaldo Prokuda—we agree with the referee that in deciding to close the investigation of Ubaldo Prokuda's potential culpability, petitioner's trial counsel, William Clark, did not perform below an objective standard of reasonableness under prevailing professional norms.

### D. *The Decision Not to Base a Defense on Ubaldo Prokuda's Potential Culpability*

█ The referee concluded that William Clark, as petitioner's trial counsel, having reasonably decided to curtail further investigation of Ubaldo Prokuda's potential culpability, also acted reasonably in deciding not to introduce any evidence at trial in support of a theory that Ubaldo and not petitioner had committed the murder. We agree that in not introducing evidence in support of a theory that Ubaldo was the killer, trial counsel's performance did not fall below an objective standard of reasonableness under prevailing professional norms.

As the referee observed, there was a "tremendous disparity in the relative strengths" of the inculpatory evidence known to Clark as to the two potential third party suspects—Gregory Cudjo and Ubaldo Prokuda. Because Gregory Cudjo had no alibi and was otherwise a viable suspect, whereas Ubaldo Prokuda's alibi was supported by virtually overwhelming evidence and he had no apparent reason to kill his wife, petitioner's trial attorney, William Clark, exercised reasonable professional judgment in not presenting any evidence of Ubaldo Prokuda's potential culpability at petitioner's trial.

We conclude that petitioner has failed to establish the deficient performance component of the ineffectiveness claim. We would reach the same

conclusion if we examined only the prejudice component of the claim. We conclude, in other words, that even if trial counsel had discovered all evidence that petitioner claims he should have discovered, and had presented all this evidence to the jury, petitioner has not shown a reasonable probability that the jury would have returned a verdict more favorable to him.

Petitioner asserts that his trial attorney should have discovered and presented evidence that two individuals—Alander Wilson and James Henry—heard Kevin Prokuda say that his "daddy" had killed his "mommy" and that three individuals—Lora Johnson, James Henry, and Vicki Henry—had seen Ubaldo Prokuda's vehicle at the Prokuda residence around noon on the day of the murder. But petitioner did not call any of these individuals as witnesses at the reference hearing, relying instead on stipulations and declarations.[3] In a habeas corpus proceeding, a petitioner who seeks relief on the ground of inadequate investigation by trial counsel "generally cannot expect to establish a case for relief solely by relying on testimony, expert or otherwise, describing what evidence might have been discovered" but instead "must generally produce that evidence so the credibility of the witnesses can be tested by cross-examination." (*In re Fields, supra,* 51 Cal.3d 1063, 1071.) Absent adversarial testing of their credibility, we may not and will not assume that a jury would have found the testimony of these individuals credible or significant.

Moreover, there were significant delays in the reporting of some of these alleged observations. James and Vicki Henry delayed reporting their alleged observation of Ubaldo Prokuda's vehicle until years after the event, while James Henry did not report hearing Kevin Prokuda's alleged statement for more than seven years after the event, despite interviews with defense and prosecution interviews in the interim. These delays provide an additional reason to doubt the credibility of their proposed testimony.

## V.  Conclusion and Disposition

We conclude that petitioner has failed to prove by a preponderance of the evidence that he was denied effective assistance of counsel at trial by virtue

---

[3]At the reference hearing, the parties stipulated that if he were called as a witness, James Henry would testify that on the afternoon of the day of the murder, Kevin Prokuda approached him and said, "My Daddy killed my Mommy." He would also testify that "Kevin appeared to be arguing with his brother, Anton" and that he heard Anton say to Kevin: "Don't say anything. Be quiet."

In a declaration attached to the traverse, Alander Wilson affirmed that Kevin Prokuda had said "My daddy killed my mommy." Because this declaration was never offered or received in evidence at the reference hearing, it may be considered only as part of petitioner's allegations, or as tending to establish petitioner's good faith in making the allegations, but not as proof of the allegations. (*In re Fields* (1990) 51 Cal.3d 1063, 1070 & fn. 2 [275 Cal.Rptr. 384, 800 P.2d 862].)

of his trial attorney's failure to investigate and present evidence inculpating Ubaldo Prokuda for the murder of Amelia Prokuda. After considering the record of the hearing and the referee's report, we conclude that petitioner has failed to demonstrate either that his trial attorney's performance fell below an objective standard of reasonableness under prevailing professional norms or that the trial would have resulted in an outcome more favorable to petitioner if counsel had presented available evidence concerning the alleged culpability of Ubaldo Prokuda. In reaching the latter conclusion, we find that petitioner has failed to demonstrate that there is any substantial and credible evidence that Ubaldo Prokuda murdered his wife.

Because our order to show cause and our reference order were limited to this claim, we do not here address any other claim set forth in the petition, which is resolved by a separate summary denial order.

The order to show cause is discharged.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I dissent.

I would grant the petition for writ of habeas corpus and vacate the underlying judgment in its entirety. I joined in Justice Kennard's dissenting opinion in the appeal. (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 637-643 [25 Cal.Rptr.2d 390, 863 P.2d 635] (dis. opn. of Kennard, J.).) At that time, I concluded that both the guilt and penalty determinations had to be set aside. I continue to hold that view today.

Even if I did not, there remain sufficient legal and factual problems with the trial and with the judgment that ensued to cast doubt on the propriety of putting petitioner to death. He is probably guilty of the offense charged. But only probably. That, I conclude, is not sufficient to justify the ultimate sanction.

Petitioner's application for a rehearing was denied July 28, 1999. Mosk, J., was of the opinion that the application should be granted.