Filed 5/16/13  P. v. Reyes CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B240698 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. VA118830) |
| CARL JOSEPH REYES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Thomas I. McKnew, Jr., Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

A jury convicted appellant, Carl Joseph Reyes, of felony child abuse (Pen. Code, § 273a, subd. (a)),**1** and found true an enhancement allegation that, in committing that offense, appellant personally inflicted great bodily injury on a child under the age of five (§ 12022.7, subd. (d)).  The court imposed a prison term of nine years, consisting of the middle term of four years on the substantive offense and five years consecutively on the accompanying enhancement.

Appellant contends that (1) the trial court should have excluded his confession obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and (2) he received ineffective assistance of counsel.  We reject these contentions and affirm the judgment.**2**

## FACTUAL BACKGROUND

Antonio P. along with his partner Venus L. and their four children lived on Redcoach Lane in Whittier.  Appellant was hired on September 2, 2010, to take care of the children while Antonio P. and Venus L. worked outside the home.  Appellant's duties consisted of taking the three older children to school in the morning, providing care for two-year-old J.P. during the daytime, and then picking up the older children from school and taking care of all four children until either Antonio P. or Venus L. returned home in the evening.

On February 28, 2011, at approximately 8:30 a.m. appellant returned to the house with J.P. after taking the older children to school.  Appellant and J.P. played outside for about 10 minutes before J.P. went to the bathroom.  Appellant told J.P. to wash and dry his hands after urinating.  J.P. needed help to use the sink because he was too short to reach it himself.  There was no step stool in the bathroom and Venus L. had never seen

---

**1**     All further statutory references are to the Penal Code unless otherwise stated.

**2**     Concurrently with this appeal, on February 20, 2013, appellant filed a petition for writ of habeas corpus in case No. B246957, alleging the same grounds raised in this appeal.  We shall dispose of the petition by a separate order.

J.P. climb up onto the sink. Appellant ran the hot water in the sink and J.P.'s hands were badly burned.

Appellant called Antonio P. and told him there had been an accident when he tried to give J.P. a bath. Antonio P. told appellant to call 9-1-1 and an ambulance transported J.P. and appellant to a local hospital. When Antonio P. arrived at the hospital shortly thereafter he did not see appellant but was told by a sheriff's deputy that appellant was at the hospital. J.P. was subsequently transferred to the Grossman Burn Center in Santa Ana.

Detective Claudia Garcia is a child abuse investigator with the Los Angeles County Sheriff's Department. When she responded to the residence on Redcoach Lane she saw appellant seated in the back seat of a police car and Antonio P. standing in the front yard. Detective Garcia inspected the house and used a thermometer to check the temperature of the water in the bathroom sink. The water reached a high temperature of 110 degrees. She interviewed Antonio P. but did not record the interview. Detective Garcia then interviewed appellant inside the residence. They were seated at the kitchen table. The interview was recorded and the audiotape was played for the jury.

According to the transcript of the interview, Detective Garcia initially told appellant that she questioned Antonio P. about what happened and wanted to do the same with appellant. She told him it was an investigation and he was not under arrest. She told appellant, "When you don't want to talk, we just don't talk, okay?"

Appellant initially provided personal background information in response to Detective Garcia's questions. Then he said he took J.P. to the bathroom to urinate in the toilet and left him there. Appellant said J.P. was able to climb up and turn on the faucet to wash his hands. Appellant heard J.P. crying. Detective Garcia told appellant that the scenario he described was not consistent with the results of their investigation. She asked if something happened and if appellant got frustrated or lost control. Appellant said he was "really stressed lately." Initially he was paid $250 each week but he was told his pay was going to be cut. He got in trouble for some things that happened at the house and he felt his work was not appreciated. When Detective Garcia asked appellant if he felt bad,

3

he replied "I didn't mean to hurt him," and said he had J.P. wash his hands in hot water in the bathroom sink.

Appellant said that J.P. was fine and sometimes "gets a little crazy" but the three other kids were always loud and fighting and did not listen to him. Appellant was upset because J.P. had not eaten his food. He "kind of got a little mad at [J.P.] because he wasn't eating his food and he had it in his mouth for so long and [appellant] was asking him to eat it . . . ." When he took J.P. to the bathroom to urinate he noticed that J.P. still had food in his mouth. Appellant was angry. J.P. started to cry and struggled when the water became hot while he was washing his hands. When Detective Garcia asked how J.P.'s hands got burnt appellant stated, "I was just holding him."

Appellant said it was hard for him to tell anybody but it was easier to open up to Detective Garcia. He was not a professional babysitter and was upset because Antonio P. and Venus L. always criticized his work. He held J.P.'s hands in the hot water for "[p]robably less than a minute but not five minutes." He turned off the hot water and put cold water on J.P.'s hands and dried them. When he saw the skin was peeling he called Antonio P.

Detective Garcia asked appellant to show them the bathroom because J.P. was taken to a burn center and it was important for them to know how it happened. Appellant was "a little uncomfortable," and said, "I should have thought twice about it. Honestly that's not me. I'm not really sure what happened. I kind of lost it a little bit." Appellant used a stuffed teddy bear to demonstrate how he held J.P.'s hands under the hot water. Sergeant Al Fraijo video-recorded the demonstration by appellant and the DVD recording was played for the jury.

Dr. Andrea Dunkelman operated on J.P. at the Grossman Burn Center. She testified that J.P. suffered mostly deep second-degree and some superficial third-degree burns on his hands. Dr. Dunkelman qualified as an expert witness and opined that the burns appeared to be the result of an intentional injury rather than an accident. There was a straight-line border between the burned and nonburned parts of J.P.'s hands and that usually indicated that somebody had been dipped in water. Accidental burns resulting

4

from a fall or running water generally seem to be more uneven. Dr. Dunkelman opined that based on J.P.'s injuries, if the temperature of the water was 110 degrees then J.P.'s hands had to have been completely under water for at least 30 seconds.

Appellant did not present a defense or call any witnesses.

## PROCEDURAL BACKGROUND

Before trial began, appellant requested a hearing on the admissibility of his statement on the grounds that he was not properly advised of his rights under *Miranda*, and that the statement was not made voluntarily. (*Miranda, supra,* 384 U.S. 436.) The court conducted a hearing under Evidence Code section 402, to determine the circumstances surrounding the interview, i.e., whether the interview was a custodial interrogation and whether the statement was involuntary.

At the hearing under Evidence Code section 402, Deputy David Sotomayor from the Los Angeles County Sheriff's Department testified that he responded to a radio call regarding an incident involving a two-year-old child and learned the child had been transported to Whittier Presbyterian Hospital. Upon arriving at the hospital he saw appellant in a room next door to where J.P. was being treated for his burns. Antonio P. and Venus L. were very upset when they arrived at the hospital and wanted to speak to appellant. Deputy Sotomayor told them the matter was under investigation and not to speak with appellant. A deputy stood in the hallway between the two hospital rooms for safety reasons. Deputy Sotomayor gathered information from the fire department personnel, paramedics and the doctor. After speaking with the nurse he asked appellant what happened at the residence on Redcoach Lane. Deputy Sotomayor testified that he considered appellant detained at this point because the child could not speak and Deputy Sotomayor needed to find out what happened back at the house.

At approximately 11:05 a.m., while still at the hospital, Deputy Sotomayor contacted the Special Victims Bureau. Venus L. accompanied J.P. when he was transferred to the Grossman Burn Center, and Antonio P. left to take care of child care issues related to the other children. At that point, Deputy Sotomayor contacted appellant and "asked him if he had a ride." Appellant said he was unable to contact his father and

asked Deputy Sotomayor for a ride back to the Redcoach Lane house where all his belongings were located. Deputy Sotomayor testified that whenever he put anyone in his car it was his custom and practice to do a quick pat down to make sure they had no weapons. He did not take anything away from appellant and did not handcuff him.

Deputy Sotomayor left the hospital at approximately 1:15 p.m. and parked outside the house on Redcoach Lane. He did not let appellant leave the car for his own safety because Antonio P. was at the house. The Special Victims Bureau personnel showed up approximately 10 to 15 minutes later. Appellant never asked to eat or go to the bathroom while with Deputy Sotomayor. Detective Garcia took appellant inside the house. When Detective Garcia arrested appellant at approximately 4:45 p.m., Deputy Sotomayor handcuffed him and transported him to the police station.

Detective Garcia testified that she was the investigating officer on the case. When she arrived at the Redcoach Lane residence she saw Deputy Sotomayor in his patrol car, appellant sitting in the back seat, and Antonio P. in the front yard. When she first contacted appellant in the police car she told him he was not under arrest and that she needed to talk to him about what happened to J.P.

Appellant was not handcuffed at this time and sat down at the kitchen table to talk with Detective Garcia. The interview was recorded. Appellant was emotional but said he felt comfortable speaking to Detective Garcia. Detective Garcia testified that she did not make any promises to appellant regarding his case, and did not deprive him of food, water, or bathroom breaks. After the interview in the kitchen was completed, appellant did a walk-through in the bathroom where he demonstrated what happened to J.P. Appellant agreed to have the demonstration video-recorded by Sergeant Fraijo.

Detective Garcia testified that she did not initially consider appellant a suspect and interviewed him because she wanted to know what happened and he was the only person with J.P. at the time of the incident. He became a suspect and was arrested when he told the truth about the incident.

The prosecutor argued that *Miranda* warnings were unnecessary because appellant was kept in a separate room from J.P.'s parents for his own safety, the period of detention

6

was reasonable, and appellant was comfortable speaking to Detective Garcia. There was no evidence that appellant was coerced in any way that would make the statements involuntary. Appellant's counsel argued that appellant's extended detention exceeded the permissible bounds of a *Terry* investigative stop and "the detention became a de facto arrest simply by the passage of time." (*Terry v. Ohio* (1968) 392 U.S. 1.)

Finding that appellant was not in custody and that the questioning was not a custodial interrogation, the court found no evidence that appellant was deprived of his *Miranda* rights or that any statements were involuntarily made.

## DISCUSSION

**I.     The Trial Court Properly Admitted Appellant's Statement to Police**

Appellant contends the court committed reversible error in denying his motion to suppress all evidence of the statements he gave police. Appellant raises the same issues argued below: that the interview with police was a custodial interrogation for which a *Miranda* warning should have been issued, and the tactics used by the police were so coercive that the statement was involuntary.

### A.     *Standard of Review*

The standards of review for *Miranda* and voluntariness challenges are similar: For the former: "[W]e review independently a trial court's ruling on a motion to suppress a statement under *Miranda.* [Citation.] In doing so, however, 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1092–1093.) For the latter: "We review independently a trial court's determinations as to whether coercive police activity was present and whether the statement was voluntary. [Citation.] We review the trial court's findings as to the circumstances surrounding the confession, including the characteristics of the accused and the details of the interrogation, for substantial evidence. [Citation.] '[T]o the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence.' [Citation.]" (*Id.* at p. 1093.)

7

### B. Appellant's Police Interview Was Not a "Custodial Interrogation"

To invoke the protections of *Miranda,* a suspect must be subjected to a "custodial interrogation." This occurs when a person is "taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." (*Miranda, supra,* 384 U.S. at p. 444.) "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121, 1125, quoting *Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) Where no formal arrest has taken place, the pertinent question is "how a reasonable [person] in the suspect's position would have understood [the] situation." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 442.)

California courts have identified a number of factors relevant to this determination. While no one factor is conclusive, relevant factors include: "'(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.'" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403.)

Here, the factual circumstances included: Appellant was not placed under arrest until approximately 4:45 p.m. Appellant was not handcuffed or arrested at the hospital, or at any time while in the presence of Deputy Sotomayor. He was already in a different room from where J.P. was being treated when Deputy Sotomayor arrived at the hospital, and was kept apart from J.P.'s parents for his own safety because they were extremely upset. When J.P. was transported to a different hospital appellant asked Deputy Sotomayor for a ride back to the Redcoach Lane residence because appellant was unable to contact his father. Deputy Sotomayor testified that whenever he transported people in his car he always patted them down for weapons. He did so in this case and there was no evidence that he took any of appellant's property from him. Deputy Sotomayor did not let appellant get out of the car when they arrived at the Redcoach Lane residence because Antonio P. was in the front yard. Detective Garcia told appellant when he was seated in the patrol car that he was not under arrest. The interview took place at the Redcoach

8

Lane residence while the participants were seated at the kitchen table. There were two detectives and another officer present during appellant's interview but the transcript shows that aside from two questions asked by Sergeant Fraijo while video recording appellant's bathroom walk through, Detective Garcia was the only officer who questioned appellant. Detective Garcia did press appellant for more details but we do not discern any overbearing demeanor from her. Her questioning does not appear to be compulsive in any sense. "General on-the-scene questioning as to the facts surrounding a crime or other general questioning of citizens in the fact-finding process" is not affected by the holding in *Miranda*. (*Miranda, supra,* 384 U.S. at p. 477.)

The only factor that supports appellant's position and that which he stresses on appeal is the length of the detention. Appellant contends the duration of time he spent at the hospital, in the patrol car, and at the residence during the questioning, would lead a reasonable person to consider themselves in custody and not free to leave.

However, in deciding the custody issue for purposes of *Miranda*, it is the totality of circumstances that is relevant; "no one factor is dispositive." (*People v. Boyer* (1989) 48 Cal.3d 247, 272.) And this one factor—length of detention—is rationally explainable here. Appellant had no means of transportation and remained at the hospital while Deputy Sotomayor was gathering information from the paramedics and hospital personnel. Appellant asked Deputy Sotomayor for a ride back to the Redcoach Lane residence. For appellant's safety he remained in the car outside the house because Antonio P. was in the front yard. Therefore, given the absence of objective indicia of arrest and considering the totality of the circumstances, we conclude that while appellant was detained, he was not in custody for *Miranda* purposes.

## C.  *Appellant's Statement to Police Was Voluntary*

Appellant contends the totality of the circumstances surrounding the interview by Detective Garcia indicate the statement was involuntary and the trial court committed reversible error in denying his motion to exclude.

We disagree. When appellant was questioned, no guns were pointed at him, he was not at a police station, and he was not handcuffed. For *Miranda* purposes, "the

crucial consideration is the degree of coercive restraint to which a reasonable citizen believes he is subject *at the time of questioning*." (*People v. Taylor* (1986) 178 Cal.App.3d 217, 230.) Appellant was told he did not have to speak to Detective Garcia if he did not want to and he was not under arrest.[3] Appellant was never promised anything in return for his statement and was never threatened throughout the interview. There is no indication that he asked for any food, drink, or break, and therefore no evidence that he was deprived of same. The evidence showed that during the interview with Detective Garcia appellant stated, "It's hard for me to tell anybody, but it's easier to open up to you."

The court below could reasonably conclude that appellant was comfortable talking to Detective Garcia and voluntarily made the statement. "While we must review the record and make an independent determination of the question, we, . . . 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence. [Citation.]" (*People v. Jennings* (1988) 46 Cal.3d 963, 979.) We find no error in the trial court's ruling.

## II. Ineffective Assistance of Counsel

Appellant contends that trial counsel provided ineffective assistance of counsel in (1) failing to attach a copy of the transcript of the police-recorded statement to his motions to suppress or to have a copy of the transcript admitted at the hearing, and (2) failing to request a jury instruction on the defense of accident in accordance with Judicial Council of California Criminal Jury Instructions, CALCRIM No. 3404.[4]

---

[3] Detective Garcia testified at the Evidence Code section 402 hearing that she believed she also told appellant that he was free to leave but that was not included in the transcript of the recorded interview.

[4] CALCRIM No. 3404 provides in part as follows (as to general or specific intent crimes): "[The defendant is not guilty of _____ <*insert crime*[*s*]> if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of _____ <*insert crime*[*s*]> unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent.]"

10

When a defendant raises a claim of ineffective assistance of counsel, he must establish that his "'counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome.'" (*In re Cudjo* (1999) 20 Cal.4th 673, 687; accord, *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.) "'"'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'"'" (*In re Cudjo, supra,* at p. 687; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 686.)

There is no merit to appellant's contention that the absence of the transcript "defeated what was otherwise the very strong prospects of success for the motions." On the question of voluntariness the transcript would not have assisted appellant because it would clearly have shown that Detective Garcia's questioning of appellant was not threatening or coercive and appellant felt comfortable talking to her. The transcript indicated that Detective Garcia specifically told appellant at the beginning of the interview that he was not under arrest. There is no reasonable probability that, but for counsel's failure to seek admission of the transcript, the ruling on the motions to suppress, or indeed the trial, would have resulted in a more favorable outcome. (*In re Cudjo, supra,* 20 Cal.4th at p. 687.)

Nor is there any merit to appellant's claim that trial counsel was ineffective for failing to request a jury instruction on the defense of accident. A court may refuse an instruction offered by the defendant if it is not supported by substantial evidence. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.)

Appellant contends that trial counsel argued the affirmative defense of accident but it is "axiomatic that argument is not evidence." (*People v. Breaux* (1991) 1 Cal.4th 281, 313.) Contrary to appellant's contention, the defense was not "a most viable one" and the recorded statement did not "set forth how he accidentally caused the burns to [J.P.]." A trial court has a duty to instruct on all general principles of law that are closely

11

and openly connected to the facts and that are necessary for the jury's understanding of the case. But the substantial evidence in this case (including the transcript of the recorded statement) reflected that appellant held J.P.'s hands under hot water. We are also satisfied that the failure to give the accident instruction did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:



_____, P. J.

BOREN


_____, J.

CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12