Filed 2/18/14  P. v. Manning CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ADAM JAROME MANNING,<br><br>    Defendant and Appellant. | B241065<br><br>(Los Angeles County<br>Super. Ct. No. NA089879) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Tomson T. Ong, Judge.  Affirmed.

William P. Daley for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant Adam Jarome Manning appeals from the judgment entered upon his conviction by jury of two counts of pimping a minor over age 16 (Pen. Code, § 266h, subd. (b)(1),[1] counts 1 and 3), two counts of pandering by encouraging a minor over age 16 (§ 266i, subd. (b)(1), counts 4 and 6), one count of pimping a minor under age 16 (§ 266h, subd. (b)(2), count 2), one count of pandering by encouraging a minor under age 16 (§ 266i, subd. (b)(2), count 5), and six counts of lewd acts upon a child (§ 288, subd. (a), counts 7–12). The jury also found true allegations that counts 1 through 6 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A)). The trial court sentenced appellant to a total term of 36 years and four months in state prison. The trial court awarded appellant 93 days of custody credit.

Appellant contends that (1) the trial court erred by allowing a police officer to testify regarding the Stockholm Syndrome, (2) the trial court erred in giving the adoptive admission instruction (CALJIC No. 2.71.5), (3) the trial court failed to instruct on lesser included offenses, and (4) appellant suffered ineffective assistance of counsel.

Finding no merit to appellant's contentions we affirm the judgment.

## FACTUAL SUMMARY

**Prosecution Case**

*16-year-old Z.S.*

In June 2011, appellant contacted 16-year-old Z.S. on the Internet via Facebook.[2] Z.S. told appellant her address and he picked her up in his silver-colored Mustang and took her to an apartment. Approximately one week later, Z.S. and appellant had sex and she became his girlfriend. Z.S. called appellant "G-Baby" and she knew he was a member of the Baby Insane clique of the Insane Crips gang.

Approximately two weeks later Z.S. began working as a prostitute for appellant. Appellant explained the "rules of the game" to Z.S. Z.S. was not to talk to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Facebook is an Internet social networking site. (See *In re Victor L.* (2010) 182 Cal.App.4th 902, 906.)

African-American males or make eye contact with them because they could be pimps. Appellant gave Z.S. condoms and told her to charge $100 to $150 for sex, $60 for fellatio, and $1,000 for anal sex. Z.S. was to hand over all the money to appellant. Appellant bought Z.S. clothing and took her to the nail and hair salon. He bought her junk food and provided her with a place to sleep at a hotel. Z.S. worked as a prostitute for appellant for approximately 30 nights. She performed two or three sex acts each night and earned thousands of dollars for appellant. While Z.S. worked, appellant parked his Mustang on a nearby street. At trial, Z.S. remembered the car had a dent on the driver's side, but she did not know when the damage occurred.

### 13-year-old J.J.

In June 2011, Z.S. introduced her 13-year-old cousin J.J. to appellant and they talked about J.J. working as a prostitute for appellant. Z.S. told appellant that J.J. was 13 years old. Appellant picked up Z.S. and J.J. and drove them to the Luxury Inn Motel in Long Beach. When they went inside the motel room, there was another man and a girl who J.J. described as "another pimp and another ho." Between the end of June and early July, appellant had sex with J.J. "at least two times." The first time they had sex was in the motel room when Z.S. and another man were present. In addition to intercourse, appellant placed his mouth on J.J.'s vagina and orally copulated her once, and J.J. performed fellatio on appellant at least three different times. J.J. and appellant had intercourse at the Carson Plaza Hotel on July 8, 2011, the day before she was arrested.

Appellant explained similar "rules of the game" to J.J. that he had earlier told Z.S. He told her, "Stay loyal. Keep your head down. Don't talk to any square niggers." He also told her how much to charge for various sex acts and told her that she was to give him all the money. Appellant provided J.J. with condoms, a telephone, and clothing. He dropped her off at various locations in Los Angeles County and watched from a distance in his car. Prior to her arrest on July 9, 2011, J.J. worked for appellant four or five times and met with three or four men on average each time. Appellant hit J.J. twice when he found out that she kept $50 from the money she earned.

3

### 16-year-old S.M.

In July 2011, J.J. introduced her 16-year-old best friend, S.M., to appellant. Appellant picked up S.M. from her home and took her to a motel room. S.M. was introduced to another man in the motel room who told appellant that he wanted S.M. on his "team." Appellant and the other man, who S.M. believed to be a pimp, argued over who would get her on his team. At some point, appellant had intercourse with S.M. S.M. testified that she ended up on "G-baby's" team with J.J. and Z.S. Appellant supplied S.M. with condoms and on the two occasions she went out to work as a prostitute she gave appellant the money she earned. S.M. testified that appellant drove a silver-colored Mustang but at trial she could not remember which side of the car was damaged.

### Investigation and Arrest

On July 9, 2011, Los Angeles Police Department Sergeant Marc Evans was patrolling an area in North Hollywood known for street prostitution. Sergeant Evans saw S.M. and J.J. speak with a number of Hispanic men including one who entered an alley after speaking with S.M. and J.J. Sergeant Evans saw S.M. and J.J. walk away from a silver-colored Mustang with "high end" chrome custom rims and enter the alley. S.M. and J.J. performed a sex act on the Hispanic male in the alley. Sergeant Evans called in other police officers to the area. S.M. and J.J. were arrested.

Long Beach Police Department (LBPD) Detective Kenneth Turner conducted an investigation into human trafficking and met with S.M., J.J., and Z.S. to identify the perpetrator. The girls were kept separated and each of them identified appellant from a six-pack photographic lineup.

LBPD Detective Chris Zamora testified as a gang expert. He had spent most of his career investigating the criminal activities of the Insane Crips gang, the largest Crips gang in Long Beach. Appellant was a self-admitted member of the Insane Crips with the moniker "G-Baby" and had numerous tattoos signifying allegiance to the Insane Crips. He had been arrested three times for violation of the Insane Crips gang injunction. Responding to a hypothetical question based on the facts of this case, Detective Zamora

4

opined that the acts were committed in association with, and for the benefit of the Insane Crips gang.

**Defense Case**

Christine Boodhai, appellant's mother helped defense counsel prepare two calendar charts to account for appellant's time between June 1 and July 9, 2011.[3] Ms. Boodhai purchased a silver-colored Mustang with "shiny" alloy type rims for appellant and paid for the insurance. The Mustang was in a repair shop from May 20 through June 15, 2011.[4] Ms. Boodhai testified that appellant was involved in an accident on Sunday, June 24, 2011, at Magic Mountain in Valencia. The Mustang was "totaled" and surrendered to the insurance company. Ms. Boodhai brought Allstate Insurance documents to court and agreed that the "Date of Loss" was the same as the date of the accident. The "Date of Loss" according to the insurance documents was July 13, 2011. Later, Ms. Boodhai testified that the July 13 date in the insurance documents was not the date the accident occurred and assumed it was the date the insurance company completed the paperwork. Ms. Boodhai testified that she was aware of appellant's whereabouts between June 1 and July 9, 2011, and there was no block of time in which appellant could have stayed 20 nights in a motel.

Ann Smith, appellant's great-aunt, testified that from July 3 through July 17, 2011, appellant spent the evenings with her. Smith was arrested for forgery and passing bad checks and convicted of a felony in 2006. She denied convictions for false identification to a police officer and assault with a deadly weapon, and denied that she was arrested for assaulting a school officer.

Monique Sims, appellant's cousin, also testified for the defense. She was not acquainted with Z.S., J.J., or S.M., but she could recognize them. She testified that on a

---

[3]     The calendar charts were not admitted into evidence.

[4]     On May 19, 2011, LBPD Officer Matthew Mills stopped appellant after he left the scene of a traffic accident. There was damage to the Mustang's passenger side and appellant told Officer Mills the damage was the result of a side-swipe collision with another vehicle.

number of occasions in June or July, she saw them enter and exit a burgundy-colored Cadillac driven by a male. Appellant was not the driver of the Cadillac. Smith acknowledged that she suffered convictions for two counts of felony burglary and forgery in 2008, and a conviction for grand theft in 2007, but opined that she was wrongly convicted.

**People's Rebuttal**

LBPD Detective Satwan Johnson was involved in an automobile accident on January 13, 2011, and filed a claim with her insurance company. The date of "total loss" on her insurance paperwork was the same date of her car accident. Detective Johnson reviewed the chart prepared by appellant's mother and her testimony which indicated that appellant left Long Beach at 2:00 p.m. on Sunday, June 24, and that appellant's car was totaled at Magic Mountain in Valencia, at 2:30 p.m. Detective Johnson drove from Long Beach to Valencia many times and estimated the trip "takes about [an] hour and a half to two hours, depending on traffic." She testified that there was "no way" to "make it in 30 minutes" "unless you had a helicopter."

## DISCUSSION

### I. Detective Turner's Testimony

#### A. *Contention*

Appellant contends that the trial court erred in permitting Detective Turner to testify regarding the Stockholm Syndrome because he was not qualified to testify as an expert on the subject. The People argue that appellant failed to object below and the issue is waived on appeal. The People further argue that Detective Turner was qualified to testify as an expert.

#### B. *Background*

During the prosecutor's direct examination, Detective Turner testified regarding his personal involvement in arresting 350 to 400 prostitutes, and his involvement as part of a team in over a thousand arrests during his 21 years in the LBPD's vice squad. He was the lead detective of the Missing Persons and Human Trafficking Team and taught other officers how to investigate prostitution. He had testified as an expert on human

6

trafficking and prostitution numerous times. Detective Turner explained the "rules of the game" including how pimps exert control over their prostitutes. He was then asked by the prosecutor to describe Stockholm Syndrome for the jury. He stated, "Stockholm Syndrome is similar to Patty Hearst in regards to sympathizing with the captors, sympathizing with the person who had control over her." When asked how it related to the facts of this case Detective Turner continued, "What they teach at the San Diego legal training center, and it's what my partner's treatise, it's similar to the domestic violence cycle and Stockholm cycle. The pimps, in the process they put the girls through, indoctrinating them, getting them to be their prostitute, what they should do, prostituting is the right thing, prostituting will be fun and exciting, we will be able to achieve these things together if you prostitute for us, that type of thing." Detective Turner confirmed that based on his experience he had seen situations where a minor girl was so enthralled with the pimp that she stayed and worked for the pimp even after he abused and hit her.

On cross-examination the following colloquy occurred:

"[DEFENSE COUNSEL]: And you mentioned that, and I think it was generally, that sometimes prostitutes develop Stockholm Syndrome; is that accurate?

"[DETECTIVE TURNER]: Traits similar to Stockholm.

"[DEFENSE COUNSEL]: Not Stockholm?

"[DETECTIVE TURNER]: I'm not a doctor, so I couldn't diagnose a victim.

"[DEFENSE COUNSEL]: There has been no diagnosis of Stockholm Syndrome in either of these three victims, were there?

"[DETECTIVE TURNER]: No.

"[DEFENSE COUNSEL]: And then, in your experience, are prostitutes sometimes afraid of their pimps?

"[DETECTIVE TURNER]: Yes."

*C.*     *Analysis*

Without deciding whether appellant has forfeited his objection on appeal, we conclude that the challenged testimony by Detective Turner was properly admitted.

7

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292; *People v. Avila* (2006) 38 Cal.4th 491, 578.)

Here, appellant acknowledges that Detective Turner was qualified to testify as an expert in human trafficking but maintains that he was not qualified to offer psychological opinion testimony to explain the conduct of prostitutes. Based on our review of the record, Detective Turner's testimony that the victims had traits "similar to Stockholm" was not an offer of psychological opinion testimony. Detective Turner testified that the sympathetic feelings prostitutes have for their pimps had similarities with domestic violence and hostage/captor relationships. Detective Turner expressed no expert opinion as to whether any of the three victims suffered from Stockholm Syndrome. He specifically stated that he was not a doctor and could not diagnose such a psychological phenomenon, and that none of the victims had been diagnosed with Stockholm Syndrome.

Contrary to appellant's contention, Detective Turner did not "invoke" the Stockholm Syndrome to "explain" the relationship between the victims and appellant. Instead, his testimony to explain the conduct of the victims was based on his training and experience dealing with prostitutes and pimps gained over the course of his 21 years on the LBPD's vice squad, and his position as lead detective of the Missing Persons and Human Trafficking Team.

If we agreed with appellant and found that the trial court erred by permitting the references to Stockholm Syndrome, we nonetheless would conclude that error was harmless under *People v. Watson* (1956) 46 Cal.2d 818. Under *Watson*, appellant had the burden on appeal to show that it is reasonably probable he would have obtained a more favorable verdict had the trial court not erred. (*Id.* at p. 836.) The evidence of appellant's guilt was overwhelming. All three victims described how appellant had sex with them and induced them into prostitution. It is not reasonably probable a verdict more favorable to appellant would have resulted had the trial court excluded the challenged testimony. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 395 [court's

8

failure to limit expert's Child Sexual Abuse Accommodation Syndrome testimony was harmless error].)

## II. The Trial Court Properly Instructed the Jury on Adoptive Admissions

### A. *Contentions*

Appellant contends that the trial court erred by giving the jury an adoptive admission instruction pursuant to CALJIC No. 2.71.5 based on an argument between appellant and another pimp over who would get S.M. on his team.

### B. *Relevant Authority*

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case (*People v. Blair* (2005) 36 Cal.4th 686, 745), that is, "'""'those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'"""" (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) However, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."'" (*People v. Jablonski* (2006) 37 Cal.4th 774, 831; see *People v. Guiton, supra*, at p. 1130 [error in giving instruction that has no application to facts reviewed under harmless error standard in *People v. Watson, supra,* 46 Cal.2d 818].)

Generally, "[a] statement by someone other than the defendant is admissible as an adoptive admission if the defendant 'with knowledge of the content thereof, has by words or other conduct manifested his adoption [of] or his belief in its truth.' [Citations.] [¶] In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis* (2005) 36 Cal.4th 510, 535.)

9

## C. Background

S.M. testified that appellant took her to a motel room where another man and two other girls were present. She assumed the man was a pimp and the two girls were prostitutes. The pimp told appellant that S.M. was new and he wanted her on his "team." Appellant responded that he wanted S.M. on his team and an argument ensued between appellant and the pimp over who would get S.M. on his team. During discussions concerning jury instructions, the trial court informed the parties that it would give a sua sponte instruction on adoptive admissions. The trial court explained that the instruction was based on "the discussion allegedly of [appellant] and a certain individual as to who gets one of the workers and the negotiation is thereto." Regarding the discussion, the trial court further explained: "[Appellant] was talking about who gets the new one, the new prostitute with another person arguably named Money. . . . [Appellant] was afforded an opportunity at the time to say I don't know anything about what you are talking about, I'm not a pimp. That is, [he is] afforded the opportunity to explain or deny, of which he did not. Instead he engaged in that. That is adoptive admission of the statement made by the other person."

The jury was instructed as follows: "If you should find from the evidence that there was an occasion when the defendant, number one, under conditions which reasonably afforded him an opportunity to reply; number 2, failed to make a denial in the face of an accusation, expressed directly to him or in his presence, charging him for the crime for which the defendant now is on trial or tending to connect him with its commission; and, number 3, that he heard the accusation and understood its nature, then the circumstance of his silence and conduct on that occasion may be considered against him as indicating an admission that the accusation was true. Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it. Unless you find defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement."

10

### D. Analysis

Although the trial court does not have a sua sponte duty to instruct on adoptive admissions, it "may certainly instruct on the matter if [it] think[s] it best to do so." (*People v. Carter* (2003) 30 Cal.4th 1166, 1198.) Contrary to appellant's characterization that the instruction was based on appellant and another male in the motel explaining "the Rules," the trial court properly determined the instruction was warranted by the evidence. The instruction was based on the "negotiation" between appellant and the pimp over which one of them would get to keep S.M. on his team of prostitutes.

Appellant's conduct was not the natural reaction of an innocent man to an untrue accusation. (*People v. Simmons* (1946) 28 Cal.2d 699, 712.) The statement "I want her on my team" uttered by the pimp in the motel room provided appellant with an opportunity to ask the pimp what he was talking about and what he meant by "team." Appellant did not avail himself of that opportunity and instead argued with the pimp because he wanted S.M. to work as a prostitute for him. (See *People v. Fauber* (1992) 2 Cal.4th 792, 852 ["For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential"].) Appellant failed to deny that he was a pimp and his negotiations over S.M.'s "ownership" provided sufficient evidence that he was familiar with the rules of the game associated with prostitution and adopted the other pimp's incriminating statements.

Even assuming the trial court erred in instructing the jury with CALJIC No. 2.71.5, the error was harmless under any standard (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson, supra,* 46 Cal.2d at pp. 836–837) in view of the overwhelming evidence of appellant's guilt. All three victims provided compelling testimony describing how appellant had sex with them and then induced them into prostitution. Many details of their testimony were corroborated by Sergeant Evans. The fact that appellant failed to deny that he was a pimp was not likely to have affected the jury's decision. (*Watson, supra,* at p. 836.)

## III. Lesser Included Offenses Instruction

Appellant contends that the trial court had a sua sponte obligation to instruct the jury on lesser included offenses that were allegedly supported by the evidence. Specifically, he contends the trial court erred by not instructing on attempted pandering, attempted pimping, assault, and battery.

"Like most jurisdictions, California recognizes that an offense expressly alleged in an accusatory pleading may necessarily include one or more lesser offenses. The definition of a lesser necessarily included offense is technical and relatively clear. Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]" *People v. Birks* (1998) 19 Cal.4th 108, 117–118.)

A trial court has a sua sponte duty to instruct the jury on an uncharged offense included in the charged crime if supported by substantial evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) "Such instructions are required only when there is substantial evidence that, if the defendant is guilty at all, he is guilty of the lesser offense, but not the greater. [Citations.]" (*People v. Wyatt* (2012) 55 Cal.4th 694, 704.)

"The error in failing sua sponte to instruct, or to instruct fully, on a lesser included offense is not a fundamental structural defect in the mechanism of the criminal proceeding ([*People*] *v. Cahill* [(1993)] 5 Cal.4th 478, 502) which cannot or should not be evaluated for prejudice by reference to 'the entire cause, including the evidence' (Cal. Const., art. VI, § 13). Instead, like the erroneous introduction of an involuntary confession, or the instructional omission of an element of a charged offense or sentencing enhancement, it is a mere trial error, one committed in the presentation of the case to the jury. By the same token, the probable adverse effect of an erroneous failure to provide a lesser offense option in a particular case can readily be assessed by an individualized, concrete examination of the record in that case. Under such circumstances, as in *Cahill,* the error must therefore be evaluated under the generally applicable California test for

12

harmless error, that set forth in *Watson*." (*People v. Breverman* (1998) 19 Cal.4th 142, 176.)

The People argue that appellant invited any error when appellant's defense counsel agreed with the trial court that instructions on lesser included offenses should not be given. We need not, however, decide whether counsel's decision to forego instructions on anything other than the charged offenses rose to the level of invited error, because the record contains no substantial evidence of lesser included offenses, and in any case any error in failing to give the instruction was necessarily harmless.

On the evidence presented, there was no legally cognizable theory upon which the jury could conclude that appellant was guilty only of attempted pandering and attempted pimping, as charged in counts 1 through 6. (*People v. Kraft* (2000) 23 Cal.4th 978, 1063 [instructions on lesser included offenses require more than an unexplained rejection of the prosecution's evidence].) During the discussion on jury instructions appellant's defense counsel agreed with the trial court that appellant was raising an alibi defense. The jury was presented with two clear choices—the prosecution's evidence established completed acts of pimping and pandering, while appellant's defense, if believed, required an acquittal. Appellant was "either guilty of the crime charged or not guilty of any crime," and no instruction on the lesser included attempt offenses was required. (*People v. Barton* (1995) 12 Cal.4th 186, 196, fn. 5.)

Equally unavailing is appellant's claim with respect to the trial court's failure to instruct the jury with assault and battery as lesser included offenses of lewd acts on a child under 14, as charged in counts 7 through 12. In essence, appellant's argument is that the jury could have considered that he was merely guilty of a harmful or offensive non-sexual touching. The evidence showed that the acts underlying the charges of lewd acts upon J.J. were committed for a sexually-motivated purpose. The evidence showed that in June or early July of 2011, appellant had sexual intercourse with J.J. on more than two occasions, he placed his mouth on J.J.'s vagina and orally copulated her, and she performed fellatio on him on at least three different occasions. Instruction on the lesser included offenses was not warranted.

13

In a noncapital case, an error in failing to instruct on a lesser included offense requires reversal only if the error is prejudicial under the standard of *People v. Watson, supra,* 46 Cal.2d at page 836—that is, only if it is reasonably probable that defendant would have obtained a more favorable result if the error had not occurred. (*People v. Breverman, supra,* 19 Cal.4th at p. 178.) In other words, to find the error prejudicial, the entire record must show that if given the choice between the lesser and the greater offenses, it is reasonably probable the jury would have convicted of the lesser. (*Id.* at p. 178, fn. 25.) Appellant engaged in a persistent pattern of explicit sexual contact with J.J., and appellant has failed to show that had the jury been given the option of returning a guilty verdict on assault or battery rather than lewd acts upon a child, it would have convicted of the lesser rather than the charged offense. (Cal. Const., art. VI, § 13.)

## IV.    No Ineffective Assistance of Counsel

Appellant raises a number of instances of alleged ineffective assistance of counsel. He contends that trial counsel failed to effectively present an alibi defense for appellant or the Mustang. We examine each identified claim and reject appellant's argument.

When a defendant raises a claim of ineffective assistance of counsel, he must establish that his "'counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome.'" (*In re Cudjo* (1999) 20 Cal.4th 673, 687; accord, *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.) "'"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."'" (*In re Cudjo, supra,* at p. 687; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 686.)

Appellant's first claim is based on appellant's alibi defense and the trial court's exclusion of the two calendars prepared by appellant's mother, which accounted for appellant's time in June and July of 2011. Defense counsel asked the trial court to admit the two calendars into evidence. He argued that Ms. Boodhai prepared both calendars,

testified regarding each of the days in June and the first three days in July, and subjected herself to cross-examination. The prosecutor objected on hearsay grounds. The trial court denied defense counsel's request because the exhibits were "merely a summary of the testimony of the witness." The trial court further explained: "It is no different than [the prosecutor] doing PowerPoint presentation . . . It's generated for the purpose of advocacy in trial and summary of the evidence in trial as opposed to trial evidence itself. . . ."

Appellant claims the testimony of the witnesses was "summary in nature, with the detail left to the calendar charts" but does not state what additional details the calendars provided that Ms. Boodhai's and Ms. Smith's testimony did not cover, or how the failure to introduce these additional details prejudiced him. The relevant information contained in the two calendars was duplicative of the witnesses' testimony and further argument by defense counsel that the exhibits should be introduced into evidence would have been futile. Appellant cannot establish that counsel's performance was unreasonable or that he suffered any prejudice.

Appellant next claims that counsel was not familiar with the "background of his witnesses" because if he had known of the prior convictions suffered by Ms. Smith and Ms. Sims, he could have raised the issues on direct examination and "minimized the harm."

Appellant fails to show that the decision by defense counsel not to ask about the prior convictions on direct examination was unreasonable under the circumstances of this case. Ms. Smith denied that she suffered convictions for false identification to a police officer in 1999 or for assault with a deadly weapon in 1975, and the prosecutor did not impeach her with official records or evidence of these incidents. Appellant's claim that defense counsel was not familiar with the background of the witnesses was in and of itself speculative as defense counsel may have reasonably decided to place the burden on the prosecution to prove the prior convictions. Defense counsel may for tactical reasons ask a defense witness to admit prior convictions on direct examination but we cannot find any authority for the proposition that failure to do so constitutes a deficient performance.

Moreover, appellants contention fails because his claim of prejudice is also speculative. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 [defendant must prove prejudice that is a demonstrable reality and not "simply speculation"].)

Appellant's last two claims of ineffective assistance of counsel focus on his attempt to establish an alibi for his Mustang for the June 1 to July 9 period. Appellant claims that his defense counsel was ineffective because he failed to acquire documentation or witness testimony to show that the Mustang was (1) totaled as a result of a June 24 accident, and (2) was in a body shop from May 20 to June 15.

Counsel did, in fact, try to acquire documentation from appellant's family to corroborate Ms. Boodhai's testimony that the car was totaled on June 24, 2011. At a sidebar to discuss the late disclosure of the insurance documents, defense counsel explained that the late disclosure was unintentional and that obtaining documentation was "like pulling teeth from them." He stated, "I have been asking for it for a while. They couldn't corroborate." Defense counsel may have decided as a tactical matter not to present any documentary or testimonial evidence from the repair shop, or none in fact may have existed to show the Mustang was totaled on June 24, 2011. The existence of documentary or testimonial evidence helpful to appellant's cause was highly questionable given that the insurance documents Ms. Boodhai brought to court showed that the Mustang's "Date of Loss" was July 13, 2011, four days after S.M. and J.J. were arrested.

For similar tactical reasons, defense counsel may have decided not to present evidence that the Mustang allegedly was in a repair shop until June 15, 2011. Furthermore, it was not relevant as none of the witnesses testified that they saw the Mustang or that it was operable prior to June 15. Z.S. testified that she first met appellant "in the middle" of June 2011. Defense counsel asked if it was "around the 15 of June" and she responded, "Approximately, I think so." J.J. testified that she met appellant for the first time in June 2011. When asked for a specific date she replied: "Just in the month of June." S.M. was introduced to appellant by J.J. in July 2011.

Accordingly, appellant's ineffective assistance of counsel claim fails. He has not shown his counsel's representation was deficient; nor has he shown a reasonable

16

probability that any of the things his attorney "failed" to do would have resulted in a more favorable outcome for him.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J. *

FERNS

We concur:

_____, Acting P. J.

ASHMANN-GERST

_____, J.

CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.