Filed 9/12/22 (see concurring opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL GALINDO SIFUENTES,<br><br>     Defendant and Appellant. | A162225<br><br>(Alameda County<br>Super. Ct. No. H27160B) |

In 2003, a jury convicted petitioner Miguel Galindo Sifuentes of first degree murder under a felony-murder theory after petitioner's co-felon killed Deputy Sheriff John Monego during a robbery of an Outback Steakhouse restaurant. The jury found not true the felony-murder special-circumstance allegations against petitioner (Penal Code[1], § 190.2, subd. (a)(17)(A), (G)).

In 2019, after the Legislature amended the felony-murder law, petitioner filed a petition for resentencing under former section 1170.95[2], and the trial court issued an order to show cause. (Former § 1170.95, subd. (c).) The parties agreed petitioner could not be convicted of felony murder under current section 189, subdivision (e). The question before the trial court was whether the peace officer exception in section 189, subdivision (f) applied.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Section 1170.95 (former section 1170.95) has been amended and renumbered as section 1172.6. (Stats. 2022, ch. 58, § 10, eff. June 30, 2022; see also Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022.)

The trial court found that it did and denied the petition because the People had established beyond a reasonable doubt that Monego was a peace officer who was killed while in the course of his duties, and petitioner knew or reasonably should have known that Monego, the victim, was a peace officer engaged in the performance of his duties. (§ 189, subd. (f).)

On appeal, petitioner contends that the trial court erred as follows: (1) the court used the wrong legal standard to assess whether he knew or reasonably should have known that Monego was a peace officer engaged in the performance of his duties; (2) substantial evidence does not support the court's finding that petitioner had the requisite knowledge; (3) the jury's not true findings on the felony-murder special-circumstance allegations required the court to grant the petition after petitioner established a prima facie case, regardless of section 189, subdivision (f); and (4) the court prejudicially erred by admitting victim impact testimony before ruling on his petition. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 11, 1998, at about 10:15 p.m., Jeffrey DeRespini was working as a security guard at the Monarch Hotel, which was located adjacent to the Outback Steakhouse restaurant. The two businesses shared a parking lot. Two guests approached DeRespini and told him they had seen a suspicious vehicle in the parking area in the back of the hotel. The car was a newer white vehicle with no front license plate, but they could see the word "Livermore" where the license plate should have been. When they came into the parking lot and their headlights shined on the car, they saw the occupants bend down and act suspiciously. One guest showed DeRespini where the car had been parked, but it was gone. DeRespini walked around the parking lot but did not find the white car.

2

The Outback Steakhouse was to close at 11:00 p.m. Petitioner arrived shortly before closing time and told the host that he had a group of people meeting him later. Petitioner asked if, given that the restaurant closed at 11:00 p.m., his friends would be let in if they arrived after 11:00 p.m. This server asked the manager, Jim McGinnis, whether petitioner could be seated. McGinnis told the server that petitioner could be seated, but ten or fifteen minutes later, the server inquired of McGinnis how much more time to grant petitioner's guests who had yet to arrive. The server also told McGinnis that petitioner was acting in a peculiar manner. In response, McGinnis walked through the dining room to get a look at petitioner. McGinnis walked by petitioner and noted that he was sitting in a booth with his back to the corner. He also saw that petitioner wore a baseball style hat that was pulled down so low that it concealed his eyes. As he got nearer, petitioner looked up and briefly made eye contact, but he immediately looked down to avoid further eye contact. As McGinnis got nearer, petitioner put his head further down and hunched down in the seat, causing McGinnis's view of him to disappear. Nevertheless, McGinnis did not see enough to cause him alarm, so he told the server he would give the rest of petitioner's party probably ten or fifteen more minutes to arrive, but after that, they had to close. McGinnis went back to his duties, but about five minutes later, the server returned to the office, which was located in the kitchen area, and alerted him that the restaurant was being robbed. The server then pressed a panic button that automatically dialed the police.

At this point, McGinnis came out of his office and saw numerous people, both customers and employees, running towards him in a state of panic. He heard a gunshot in the kitchen and the sound of the bullet hitting the deep fryer. At this point, Vasquez, one of petitioner's co-felons, demanded

3

to know who the manager was. McGinnis identified himself. Vasquez ordered him to the office and demanded the day's cash receipts.

While Vasquez and McGinnis were in the office the telephone rang; McGinnis testified, "I wasn't going to pay any attention to it, and very quietly he kind of put the gun sideways against my back, kind of nudged me towards the phone and said, 'That's the fucking police. That's the fucking police. Answer the phone. You better be calm or I'm going to kill you.'" Vasquez moved the gun so that it was touching the back of McGinnis's head as he picked up the phone to answer. McGinnis told 911 dispatch that everything was all right. Vasquez responded to McGinnis "'that was a smart fucking move because he didn't want to have to hurt anybody.'"

Vasquez, petitioner, and another co-felon, Le, then herded the gathered employees and customers into the walk-in refrigerator. Petitioner stood by the door to the refrigerator waving a gun around and ordering the people into the cooler. Once all were in, Vasquez told the people in the refrigerator to stay inside for three minutes and that, after three minutes, they could come out and call the police. None of the three robbers shot, hit, or violently attacked any of the civilian victims at any time during this event.

When Deputy Schwab arrived at the restaurant in a marked Dublin Police vehicle, she was dressed in full police uniform with a police radio and other police gear, including her service weapon and an expandable baton. As she was driving up to the restaurant, Schwab radioed to dispatch that she had arrived. Schwab made this transmission while she was on the driveway leading into the parking area, and about 10 seconds later, she parked her vehicle. She parked about 100 feet to the front and left of the restaurant, in plain view of its entrance. She arrived at 11:57 p.m. Schwab then walked to

4

the restaurant. She estimated that the walk from her vehicle to the front doors of the restaurant took about 30 to 45 seconds.

The restaurant entrance had a set of double doors that opened out and led into a foyer, where there was another set of double doors that opened out and led from the foyer into the restaurant. There were windows in both sets of double doors, and the whole north front of the restaurant was covered with windows. As Schwab approached the entrance, she could see four people inside who appeared to be laughing and talking. While she walked up to the east outside entrance door, Schwab looked through the windows immediately east of the restaurant's foyer. Three of the individuals she saw were younger, and one was an older African-American gentleman in a sports jacket. In questioning Schwab at trial, defense counsel referred to the older gentleman as Mr. Lewis. Schwab thought the four people were the manager and three workers. The robbers saw Schwab before she entered the restaurant, because when she entered, she was surprised by Vasquez, who was crouched down by the west interior door leading from the foyer into the restaurant pointing a gun at her waist.

While pointing his gun at her midsection, Vasquez repeatedly yelled at Schwab to give him her gun and get down. Schwab pleaded with Vasquez not to shoot her, and eventually dropped to the ground in the foyer. Vasquez kept demanding Schwab's gun and hit her in the face with a closed fist at least once. At this point, Schwab complied with the demands, unholstered her gun, and Vasquez grabbed her gun. Vasquez demanded Schwab stand up, but she was unable to do so because her legs were weak, so she scooted through a set of doors into the restaurant where she encountered Le and petitioner, along with the African-American gentleman.

5

Le pointed a gun at Schwab and told her to get up; when she complied, he put his gun into the small of her back. Le was about a foot and a half from Schwab, and petitioner stood right next to Le. Le and petitioner began walking Schwab east toward the back of the restaurant, with Le walking right behind Schwab and petitioner walking along Le's right side. Schwab lost sight of Vasquez and the African-American gentleman as she had her back to them. Vasquez never passed by Schwab. While walking, Schwab attempted to activate the emergency button on her radio, but Le told her not to mess with her radio. Schwab then heard at least five gunshots. She testified that she heard the first gunshot after walking about 20 feet. Schwab started to turn her head, but she thought better of it. When she first heard the gunshots, Schwab could only say that she was aware of Le because his weapon remained at her back. She believed that she walked another 15 feet thereafter during the course of the sound of the shots. Schwab stated that the gunshots went on for a period of time.

After the last gunshot, from the periphery of her vision, Schwab saw petitioner grab or tap Le's left shoulder, petitioner said to Le, "Go," or "Let's go," and the two men ran out the east exit door. Schwab immediately ran into the men's bathroom, closed the door, and radioed, "Shots fired, they have my gun." Thereafter, Schwab left the bathroom and walked outside through the foyer and observed Monego laying on the ground on the sidewalk outside the doors. Monego's service weapon was holstered with the cover snapped into place.

Schwab estimated that from the time she radioed dispatch of her arrival prior to parking her vehicle to when she radioed while hiding in the restroom was about two minutes. However, radio traffic demonstrated that the time between the two transmissions was one minute and 14 seconds.

6

Schwab testified that she did not hear anything to indicate that another officer or person had arrived prior to hearing the gunshots. She initially believed that Vasquez had shot the African-American gentleman because she knew he was behind her and she thought Vasquez did not want a witness.

Meanwhile, the hotel security guard DeRespini was in front of the hotel having a cigarette with another employee and her boyfriend when he saw Schwab arrive, park her marked police car, and walk up to the entrance to the restaurant. Schwab parked partly in a parking space and partly in the lane of traffic a few yards from the restaurant. She parked her patrol car in front of and to the left of the front entrance of the restaurant. DeRespini could see her police car and the front entrance of the restaurant from where he was standing in front of the hotel, and he saw her go into the restaurant.

DeRespini told the two he was talking with that it was probably a false alarm. He expected another police cover unit to arrive to follow Schwab into the restaurant. Within a couple of minutes, he saw Monego arrive in a marked patrol car and park just in front of Schwab's marked car. Monego's marked car was also parked in front of and to the left of the entrance to the restaurant. He watched as Monego, who was dressed in full police uniform, got out of his car and approached the restaurant. Monego first went to the restaurant window and peered in for a few seconds; he then went to the entrance of the restaurant and opened the left side door and began to enter. Before his full body passed through the door, DeRespini heard shots and saw Monego fly backwards out of the entrance and land on the sidewalk. DeRespini then watched as the shooter came out, took aim at Monego on the ground as he stood over him, and fired another volley of shots into him from a distance of about six feet.

7

DeRespini went into the hotel lobby and yelled for someone to call "911." Within ten seconds, he returned to his vantage point at the front of the hotel. He saw two men walking from the restaurant to a white car and saw them get into the front seats of the car. The white car was backed into its parking spot, with the front of the car facing the exit path from the parking lot. The car had no license plates, only a "Livermore" placard on the front. He recognized that this was the same car that the hotel guests had reported to him earlier that night. He watched as the car pulled out and drove away past the front of the hotel where he was standing. As the car drove by, he saw that there were two people in the front seat and one in the back seat. DeRespini watched as the car drove away from the area at a normal speed, even as more police cars arrived.

In 2003, a jury found petitioner guilty of first degree murder. The jury found not true the felony-murder special-circumstance allegations (§ 190.2, subd. (a)(17)(A), (G)). Petitioner was sentenced to 26 years to life, and the judgment was affirmed on appeal. (*People v. Vasquez* (Jan. 31, 2006, A102559) [nonpub. opn.].)

### The Resentencing Petition

The parties filed several rounds of briefing on whether the peace officer exception applied. Pursuant to the parties' agreement, the trial court issued an order to show cause at the commencement of the evidentiary hearing on the petition. After the hearing, the trial court took the matter under submission.

The trial court denied the petition in a written order because it found that the peace officer exception applied. The court found from "strong, credible, and persuasive circumstantial evidence" that, at the time of Monego's murder, petitioner "knew, or at the very least reasonably should

8

have known that the victim was a peace officer engaged in the performance of his duties." We summarize and quote from the trial court's explanation for its ruling as follows:

The evidence established a planned, armed takeover robbery of the restaurant, and the robbers considered and prepared for the response of law enforcement. Vasquez, for example, knew police were calling when he was in the manager's office. Upon seeing Schwab arrive in uniform and in a marked car, the robbers lulled her into a "false sense of security" by posing and laughing, whereafter Vasquez ambushed her at gunpoint and forced her to surrender her gun. Petitioner was present and a full participant in this surprise attack. Additionally, petitioner and Le walked Schwab towards the rear of the restaurant and Le prevented her from using her radio, showing they were keenly aware of the potential arrival of additional law enforcement officers. "The robbers expected the police to call, they expected the police to arrive, they expected the police to enter the restaurant, and they expected the captured officer to seek help. These facts lead to the inescapable conclusion that they expected more police to follow. Such evidence in conjunction with other facts in this case prove beyond a reasonable doubt that Petitioners actually knew, or at the very least should reasonably have known that the shooting victim in this case was a police officer engaged in the performance of his duties."

"Additional facts presented support this conclusion. The robbery occurred late at night after the restaurant closed, and the robbers surveilled the area outside the restaurant for a lengthy period before sending [petitioner] in to watch the interior of the restaurant for an additional extensive period of time. This demonstrates that the robbers waited until this late hour, well after the restaurant closed for the day, to commit this

9

takeover robbery without the interference of customers arriving through the front door. . . ." "[W]hen one takes a police officer at gunpoint, and cuts off her communication with her dispatcher, the only reasonable expectation is that another officer will follow. In this context, this evidence proves beyond a reasonable doubt that upon hearing a barrage of gunfire, Petitioners knew or reasonably should have known that the following law enforcement officer was the target."

"Petitioners' immediate flight thereafter further demonstrates this knowledge. Upon hearing the volley of gunshots coming from the entrance to the restaurant, Sifuentes immediately tapped Le on the shoulder and directed him to flee. Petitioners immediately lost interest in controlling Deputy Schwab, locking her up with the other hostages or preventing her from calling for help. . . . They no longer tried to prevent a call for more police because they knew from the gunfire that additional police had arrived. These actions by Petitioners, on hearing the gunfire, constitute compelling circumstantial evidence that they actually knew the gunfire was directed at a police officer engaged in the performance of his duties at the entrance to the restaurant."

"Additionally, the markedly disparate treatment of Deputy Schwab as compared to the customers and employees is noteworthy. . . . Petitioners and Vasquez did not inflict any physical violence on any of the employees or any of the customers. In contrast to this treatment of the non-police hostages, the uniformed Deputy Schwab was greeted with immediate physical violence. Further, while Vasquez did fire a shot into the fryer during the robbery, no evidence in this case supports any actual or reasonable belief by Petitioners that Vasquez would fire seven shots in rapid succession at the unlikely late-arriving diner."

10

The court then summarized what petitioner knew up to the moment of the gunfire: the restaurant had been closed for an hour; the robbers had taken over a large restaurant; a loud gunshot had been fired to gain compliance from the robbery victims; the robbers had at least fifteen people detained in the walk-in refrigerator; a uniformed police officer in a marked patrol car had responded; "moments" before "the eruption of gunfire at the foyer," Vasquez assaulted and disarmed Schwab; and the robbers kidnapped Schwab and prevented her from using her radio. "These circumstances prove beyond a reasonable doubt that Petitioners knew or reasonably should have known that the target of Vasquez's volley of shots was a peace officer engaged in the performance of his duties." The court acknowledged that neither Le nor petitioner "confessed to personally observing Vasquez shooting Deputy Monego and that they were aware Deputy Monego was a peace office engaged in the performance of his duties." But such confession was not required given the "abundance of circumstantial evidence . . . compel[ing] the Court to conclude beyond a reasonable doubt that Petitioners knew or reasonably should have known that the victim was a peace officer engaged in the performance of his duties."

## DISCUSSION

### I. Felony-Murder Law

Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including those "committed in the perpetration of, or attempt to perpetrate, [certain listed felonies, including robbery]." (§ 189, subd. (a).) Prior to the enactment of Senate Bill No. 1437, this form of first degree murder, known as first degree felony murder, did not require malice. (See *People v. Dillon* (1983) 34 Cal.3d 441, 475 [only criminal

11

intent required for felony murder is specific intent to commit the particular felony].)

Effective January 1, 2019, Senate Bill No. 1437 amended the felony-murder rule to provide: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e).) The new law was designed "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

But the Legislature made an exception where the victim was a peace officer engaged in the performance of his or her duties. "Subdivision (e) does not apply to a defendant when the victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subd. (f).) If section 189, subdivision (f) applies, "a defendant who participates 'in the perpetration or attempted perpetration of a felony listed in [section 189] subdivision (a) in which a death occurs is liable for murder.' " (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 108.)

The Legislature also added former section 1170.95, which created a procedure for offenders previously convicted under a felony-murder theory to obtain the benefits of these changes retrospectively. Under the statute operative at the time of petitioner's request for resentencing, convicts could petition for relief in the court where they were sentenced if (1) the complaint or information filed against them "allowed the prosecution to proceed under a theory of felony murder . . . [,]"(2) they were convicted of murder following a trial, and (3) they could not be convicted of murder "because of changes to Section 188 or 189." (Former § 1170.95, subd. (a).) In most cases where the petitioner made a prima facie showing that he or she was entitled to relief, the judge had to issue an order to show cause and hold "a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner. . . ."[3] (Former § 1170.95, subds. (c) & (d)(1); *People v. Flint* (2022) 75 Cal.App.5th 607, 613 (*Flint*).) At the hearing to determine whether the petitioner was entitled to relief, the burden was on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. (Former § 1170.95, subd. (d)(3).)

## II. The Legal Standard

Petitioner first contends that the trial court applied the wrong legal standard in assessing his petition. Specifically, he argues that the trial court asked only whether it was foreseeable that a police officer would arrive at the scene of the robbery, rather than whether petitioner "knew or reasonably

___

[3] Under former section 1170.95, subdivision (d)(2) (now section 1172.6, subdivision (d)(2)), the hearing could be avoided if the parties waived the hearing and stipulated to the petitioner's eligibility or "[i]f there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony . . . ." We address this provision, and petitioner's argument that it required the court to grant his petition without an evidentiary hearing, *post*.

13

should have known" the victim was a peace officer engaged in the performances of his duties. (§ 189, subd. (f).) As explained below, we disagree.

Petitioner is correct that the Legislature did not create a strict liability offense with the peace officer exception. "Consistent with this policy [of supporting and protecting peace officers engaged in the performance of their duties] and the applicable principles of statutory interpretation, section 189, subdivision (f), excuses the prosecution from proving . . . the defendant acted with malice when the victim of a murder committed in the course of a felony listed in section 189, subdivision (a), is a peace officer engaged in the performance of the officer's duties *and the defendant has the requisite knowledge*." (*People v. Hernandez, supra,* 60 Cal.App.5th at pp. 107–108, italics added.) The "requisite knowledge" referred to in *Hernandez* and at issue here is that "the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties."[4] (§ 189, subd. (f).)

While the meaning of "knew or reasonably should have known" in section 189, subdivision (f) has not been subject to interpretation, courts have interpreted similar statutory language. Where a provision of the Penal Code requires "knowledge" of a fact, "a subjective appreciation of that fact is an element of the offense." (*In re A.L.* (2019) 38 Cal.App.5th 15, 22, citing § 7, subd. (5) ["the word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code"].) "Knowledge" has been defined as "[a]n awareness or understanding of a fact

---

[4] The traditional felony-murder rule requires that the defendant have the specific intent to commit the felony at issue. (*People v. Lewis* (2001) 25 Cal.4th 610, 642.) That petitioner had the *mens rea* required to commit the underlying felony is not in question.

or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." (Black's Law Dictionary (11th ed. 2019) p. 1043, col. 1.)

The term "reasonably should have known," on the other hand, implicates an objective criminal negligence standard. (*In re A.L.*, *supra*, 38 Cal.App.5th at p. 24; *People v. Linwood* (2003) 105 Cal.App.4th 59, 71; *In re Jorge M.* (2000) 23 Cal.4th 866, 887, fn. 11.) If a reasonable person in the defendant's position would have been aware of the facts at issue, the defendant is presumed to have such knowledge. (See *People v. Linwood*, at p. 71.) As one court has observed, knowledge is a higher standard than criminal negligence, but both standards may be proven in much the same way: "Circumstantial evidence tending to show that a reasonable person would have known an officer was engaged in the performance of duty will likewise tend to show that a particular defendant was aware of that fact. The only difference when actual knowledge is required is that if a defendant denies knowing the relevant facts, the trier of fact must judge the credibility of that statement." (*In re A.L.,* at p. 25.)

Before turning to the merits, we briefly emphasize that the parties here agree, as do we, that the legal standard to be applied in this appeal is whether the requisite knowledge was acquired before or concurrently with the acts that caused the peace officer-victim's death. Petitioner argued below that the court had to find he had the requisite knowledge "at or before the time of the killing." The joinder of act and intent is a foundational principle of criminal law (§ 20; see, e.g., *People v. Hughes* (2001) 27 Cal.4th 287, 357–358 [a defendant convicted of robbery must have formed requisite intent to steal "prior to or during the application of force or fear" against the victim]), and the traditional felony-murder rule also required the requisite felonious

15

intent be formed "either before or during the commission of the acts that caused the victim's death." (*People v. Lewis*, *supra*, 25 Cal.4th at p. 642.) Below, the prosecution argued that the requisite knowledge existed at or before the time of the killing, and also alternatively argued that petitioner could obtain the required knowledge during the escape from a felony murder *after* the acts that caused the peace officer's death. The trial court did not reach the prosecution's alternative theory, and, at oral argument, the Attorney General agreed that the pertinent time by which knowledge had to be acquired in this case was when the multiple shots at issue were fired. The standard we apply is whether petitioner acquired the requisite knowledge before or concurrently with the acts that caused the peace officer's death.

Contrary to petitioner's assertions, the trial court's order does not reflect that it used an incorrect legal standard to assess the requisite knowledge. (See *People v. Mack* (1986) 178 Cal.App.3d 1026, 1032 [trial court is presumed to have known and applied correct statutory and case law in exercise of its official duties].) Petitioner acknowledges the court had to find that, "at or before the time of the killing," "defendant 'knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties.' " The trial court stated in its order—no less than nine times—that it had found, beyond a reasonable doubt, that petitioner knew, or reasonably should have known, that the victim was a police officer engaged in the performance of his duties. The trial court did make a number of statements indicating that petitioner and his co-felons expected police involvement, but it used this expectation, along with other facts, including that petitioner heard the barrage of gunshots, to conclude that when he heard the shots, he knew or reasonably should have known another officer was present. The court did not decide the case

16

pursuant to the wrong legal standard.[5]  The question nonetheless remains whether the evidence supports the trial court's ruling, and we now turn to that question.

## III.  Sufficiency of the Evidence

Petitioner argues that the evidence introduced below did not prove beyond a reasonable doubt that he had the requisite knowledge.  We first address the applicable standard of review and then turn to the merits.

### A. *Standard of Review*

Relying on *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), petitioner argues that, because the court's inquiry was limited to a cold record, deference to the trial court's factual findings is inappropriate.  We disagree that de novo review is appropriate under the circumstances of this case.

In *People v. Perez* (2018) 4 Cal.5th 1055 (*Perez*), our Supreme Court rejected an argument similar to petitioner's, in the context of a Proposition 36 petition for recall of a sentence.  The People argued that de novo review was "more appropriate because trial courts do not have an advantage over appellate courts in determining eligibility based on the record of conviction." (*Id.* at p. 1066.)  The Supreme Court disagreed, concluding that "even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of

---

[5] Petitioner also makes the conditional argument that, *if* the test under section 189, subdivision (f) is merely whether he foresaw police involvement, then subdivision (f) should also be interpreted to require proof that he expected Monego's death.  He adds that the jury's rejection of the felony-murder special-circumstance allegations precluded a finding that he expected Monego's death.  Because we have rejected petitioner's contention that the trial court assessed only whether he foresaw police involvement, we need not dwell on petitioner's conditional argument.

fact . . . we see no reason to withhold the deference generally afforded to such factual findings." (*Ibid.*)

*Vivar, supra*, 11 Cal.5th 510, is distinguishable. There, our Supreme Court endorsed the independent standard of review when evaluating a trial court's decision under section 1473.7 regarding whether to vacate a conviction due to negative immigration consequences stemming from the conviction. (*Id.* at pp. 524–527.) "A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a prejudicial error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*Vivar,* at p. 517, italics omitted.) In choosing independent review in this context, the court reasoned that analogous prejudice determinations in ineffective assistance of counsel claims were reviewed independently as predominantly legal questions; the interests at stake supported independent review where the determination was likely to be made from a cold record; prior appellate decisions had reviewed section 1473.7 prejudice determinations independently, and the Legislature, aware of this standard, did not alter when it amended the statute. (*Id.* at pp. 524–527.) Here, by contrast, the question whether a defendant could be liable for murder as stated in the new law presents predominantly factual questions. Moreover, *Vivar* expressly limited application of independent review to proceedings pursuant to section 1473.7. (*Id.* at p. 528, fn. 7.)

Thus, we join our colleagues in the Fourth District in recognizing that *Perez*, rather than *Vivar*, is the more persuasive authority in answering the question of what standard of review applies in this case.[6] (*People v. Clements*

---

[6] Petitioner also cites *In re Cudjo* (1999) 20 Cal.4th 673. That case involved a proceeding on a habeas corpus petition in which our Supreme

18

(2022) 75 Cal.App.5th 276, 302.)  The question of whether petitioner knew or reasonably should have known that Monego was a peace officer engaged in the performance of his duties is predominantly a question of fact.  (See *id.* at p. 302.)  Under such circumstances, "we see no reason to withhold the deference generally afforded to such factual findings." (*Perez, supra,* 4 Cal.5th at p. 1066.)  The substantial evidence standard of review applies.

## B. *Substantial Evidence Supports the Trial Court's Ruling*

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt . . . . In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.  [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends . . . .' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence." (*People v. Zamudio, supra,* 43 Cal.4th

Court found deference to the referee's factual findings "arguably inappropriate" where the findings were based solely on documentary evidence.  (*Id.* at pp. 687–688.)  But because habeas corpus bears little resemblance to appellate review of a lower court's judgment, as the People note, *In re Cudjo* is not controlling.  (See *Durdines v. Superior Court* (1999) 76 Cal.App.4th 247, 250, fn. 5 ["[B]ecause habeas corpus is a collateral attack, a court considering such a petition is not genuinely 'reviewing' an earlier judgment.  Thus, a petition for writ of habeas corpus is classified as an 'original proceeding' no matter what court it is filed in"].)

at p. 357.) We must accept all logical inferences that the trier of fact may have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Kaufman* (2017) 17 Cal.App.5th 370, 381.) It is well-settled that " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; see also *People v. Zamudio*, p. 357.)

Here, although a close case was presented to the trial court, our sole inquiry is whether there was sufficient evidence for a reasonable trier of fact to conclude beyond a reasonable doubt that petitioner knew or should have known, before or during the shooting, that a peace officer engaged in the performance of his duties was the target of the shots that caused the peace officer's death. (*People v. Romero* (2008) 44 Cal.4th 386, 399 ["The pertinent inquiry is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' "].) As set forth below, the evidence regarding the circumstances surrounding the shooting support the trial court's determination.

First, it was near midnight when the gunfire began. Schwab heard the gunshots while Le and petitioner walked her east, so the trial court reasonably inferred that petitioner heard the gunshots as well. And the evidence established a sequence of gunfire that continued over a period of time long enough for Vasquez to shoot at Monego from inside the restaurant and then walk to the door that opened to the outside and fire another "volley"

20

of shots at Monego as he lay on the sidewalk. A trier of fact could reasonably infer that petitioner, or a reasonable person in his position, who heard the barrage of gunfire in these circumstances knew or would know that Vasquez (whom petitioner knew to be armed) was shooting at another person.

Next, the gunshots were undisputedly fired at the entrance of the restaurant. The shots started just "moments" after petitioner, Le, and Schwab left Vasquez armed near this entrance with Lewis when petitioner, Le, and Schwab were only about twenty feet away. Given this evidence, it is reasonable to infer that petitioner, or a reasonable person in his position, discerned or would discern that the shots came from the entrance of the restaurant.

Based on the following evidence, a reasonable trier of fact could also conclude that petitioner, or a reasonable person in his position, knew or should have known that a police officer had arrived and was the victim of the series of shots. Petitioner and his co-felons embarked upon a highly choreographed, armed takeover robbery, and they waited to do so until close to midnight when the restaurant was closed. Before the shooting, they had secured patrons and employees in the walk-in refrigerator. And the robbers clearly knew, or reasonably should have known, that the police had been alerted and had been dispatched given Schwab's arrival in full uniform just moments before the shooting at the entrance of the restaurant. Petitioner also knew the robbers had cut off Schwab's contact with dispatch by preventing her from using her radio. Furthermore, while Lewis was near the restaurant entrance prior to the shooting, Schwab testified that Lewis was not being threatening or aggressive towards the robbers. The evidence that the parties submitted to the trial court in litigating the section resentencing petition additionally showed the robbers had not physically harmed the

21

patrons and employees, whereas Vasquez acted violently towards Schwab immediately upon her arrival.

Finally, immediately after the shooting stopped, petitioner tapped Le's shoulder and directed him to flee. The two fled, abandoning any effort to contain Schwab and prevent her from calling for help, which suggests that the robbers were aware that another officer had already arrived and it would be futile to prevent Schwab from further communication with dispatch.[7] The trial court could reasonably infer from this evidence that petitioner knew or reasonably should have known during the commission of the shots that caused Monego's death, that another officer had arrived and was the victim of Vasquez's barrage of shots.

As petitioner acknowledged at oral argument, there is no statutory requirement that the prosecution establish the requisite knowledge only through evidence that defendant saw the victim, heard the victim, or directly interacted with the victim. We have no doubt that this type of circumstantial evidence will be the evidence most often relied upon to show a defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties. But whether the defendant had knowledge of a fact is a question the trier of fact may answer with reference to all the circumstances. (See *People v. Green* (1991) 227 Cal.App.3d 692, 702 [knowledge means awareness of facts proscribed, and it is a jury question whether "gossip" or "braggadocio" are sufficient to establish knowledge], rev'd on other grounds by *People v. Castenada* (2000) 23 Cal.4th 743, 752; see also *People v. Boyden* (1953) 116 Cal.App.2d 278,

---

[7] Whether this flight could also be consistent with a belief that the victim was a civilian, and that officers would subsequently be responding due to the audible sequence of gunfire, is irrelevant on substantial evidence review. (*People v. Kaufman, supra,* 17 Cal.App.5th at p. 381.)

287–288 [defendant's knowledge that property was stolen in crime of receiving stolen property " 'need not be that actual and positive knowledge which is acquired from personal observation of the fact' "].)  On substantial evidence review, we do not substitute our assessment of the facts for the trial court's.  We find that there was sufficient circumstantial evidence to support the trial court's conclusion.

We also decline petitioner's invitation to reverse the trial court's order because he believes it was more reasonable to conclude that Vasquez shot nothing or Lewis.  Petitioner argues that a reasonable person would have thought what Schwab thought—that Vasquez shot Lewis.  But the focus is on what a reasonable person in the defendant's position would have known.  (See *In re A.L.*, *supra*, 38 Cal.App.5th at p. 21, citing *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574; *People v. Linwood*, *supra*, 105 Cal.App.4th at p. 71.)  Unlike petitioner or the hypothetical reasonable person in his position, Schwab was being held at gunpoint, and she testified she was in shock.  Schwab said that she thought Vasquez shot Lewis because he did not want a witness, but the record suggests that Schwab was unaware of the multiple unharmed witnesses in the walk-in refrigerator—again, unlike petitioner or a reasonable person in his position.  Moreover, the question before us is not whether the circumstances might also reasonably be reconciled with a finding contrary to that made by the trier of fact.  (*People v. Kaufman*, *supra*, 17 Cal.App.5th at p. 381.)

Finally, we emphasize that a general awareness that police may respond to the commission of a crime is not sufficient, and we do not construe the trial court's ruling to have rested on a mere general awareness that police may arrive at the scene of any crime.  Instead, the determination required under section 189 subdivision (f) must be made on a case-by-case basis, after

23

carefully sifting through the facts. To reverse the trial court's decision here, we would have to conclude that no rational trier of fact could have found beyond a reasonable doubt that petitioner knew, or reasonably should have known, that a peace officer performing his or her duties had arrived and was the target of Vasquez's series of shots where: it was near midnight and petitioner was in the middle of executing a planned robbery of a closed restaurant; petitioner knew unharmed witnesses were secured in the walk-in refrigerator; he knew Vasquez was armed near the entrance; he knew that someone was shooting a barrage of shots from near the restaurant entrance; he knew that bystander Lewis, who was near Vasquez, had not acted aggressively or threateningly; he knew the police had been dispatched to the scene of the crime because Vasquez had assaulted and disarmed the arriving officer, Schwab; he had taken Schwab hostage; and he knew the shooting occurred "just moments" after Schwab had arrived and been prevented from using her radio. Because we cannot conclude that no rational trier of fact could have found as the trial court did based on this evidence, we must affirm the ruling below. (*People v. Romero*, *supra*, 44 Cal.4th at p. 399.)

## IV.  Section 1172.6, subdivision (d)(2) (Former Section 1170.95, subdivision (d)(2))

Petitioner's next argument is that the trial court should never have held an evidentiary hearing. He contends that, after he established a prima facie case, the trial court should have immediately resentenced him pursuant to section 1172.6, subdivision (d)(2), given that his jury rejected the People's felony-murder special-circumstance allegations. The People disagree, arguing that petitioner was not entitled to immediate relief under that provision because the prosecution was entitled to an evidentiary hearing to show the peace officer exception under section 189, subdivision (f) applied.

24

Joining our colleagues in the Second District who recently addressed this exact issue, we agree with People. (*Flint, supra*, 75 Cal.App.5th at pp. 616–617.)

After the court has issued an order to show cause, section 1172.6, subdivision (d)(2) provides a mechanism for avoiding an evidentiary hearing where both sides waive the hearing and stipulate that the petitioner is eligible, or "[i]f there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony." (§ 1172.6, subd. (d)(2).) In the latter instance, "the court shall vacate the petitioner's conviction and resentence the petitioner." (*Ibid*.) Nonetheless, in enacting Senate Bill No. 1437, the Legislature also "created an exception [under section 189, subdivision (f)] to the new requirements for felony murder, providing that they do 'not apply to a defendant when the victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties.' [Citation.] When this exception applies, a defendant may be convicted of felony murder even if he was not a major participant in the felony who acted with reckless indifference to human life. [Citation.] But section 117[2.6], subdivision (d)(2) makes no provision for the peace officer exemption." (*People v. Flint, supra*, 75 Cal.App.5th at p. 616.)

As in *Flint*, we reject the argument that the absence of any reference to the peace officer exception in section 1172.6, subdivision (d)(2) unambiguously means a trial court cannot hold an evidentiary hearing to discern whether the peace officer exception applies when the petitioner's jury rejected a felony-murder special-circumstances allegation. (*People v. Flint*,

*supra*, 75 Cal.App.5th at p. 617.)  While we generally defer to the plain language of a statute, a statute should not be given a literal meaning if doing so would result in absurd consequences.  (*Ibid.*)  The Legislature intended to maintain broader liability for felony murder in cases where the victim was a peace officer.  (*Ibid.*)  Section 1172.6 provides retroactive relief where a petitioner "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).)  Petitioner's interpretation would make section 1172.6, subdivision (d)(2) "into a backdoor to guarantee resentencing for certain defendants who are not eligible, rather than a mechanism to 'streamline the process' of resentencing [citation] in cases where it is clear that the defendant is eligible.  This is an absurd result, which we will not infer the Legislature intended." (*People v. Flint*, at p. 617.)

## V.    Victim Impact Statements

Petitioner's final argument is that the court committed reversible error by hearing victim impact statements before ruling on his petition.

A few days before the hearing on the petition, petitioner's counsel emailed the court regarding victim impact testimony, stating, "I have previously cited to court and counsel *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 265–266, which speaks to the role of the victim's family/friends/supporters at a [former] 1170.95 hearing.  To be clear, I want Deputy Monego's family/friends/supporters to have every opportunity to be heard and I will of course defer to the court's judgment as to how to best accomplish this logistically.  In light of my reading of *Lamoureux*, my request is that the litigants present their legal arguments and the court makes its legal ruling on petition, and then the speakers be afforded their opportunity to speak.  *But again, however the court thinks best to handle this will be*

*fine.*"[8] (Italics added.) The trial court responded that it expected to take the matter under submission, so it would hear all speakers at the hearing. At the hearing, after the prosecution presented speakers, petitioner's counsel thanked the court for the opportunity to present speakers, "for the record" cited *Lamoureux*, and said he knew "the Court [would] abide by that case." The court interrupted him at that point, stating the parties had submitted legal arguments and counsel could submit something additional if he desired, but now was the time for the speakers. Counsel thanked the court and presented his speakers.

On this record, we reject petitioner's contention that the trial court committed reversible error by admitting victim impact testimony before it ruled on the petition. First, petitioner forfeited his argument because he acquiesced in the trial court's decision to hear victim impact statements when it did. The "objections" to which petitioner points this court demonstrate that his counsel told the trial court that petitioner would abide by the court's preferred method for handling victim impact statements, and counsel merely cited *People v. Lamoureux* at the hearing, stating that "he kn[e]w the Court [would] abide by that case." Second, even if petitioner's claim were cognizable and even if the court erred, he shows no prejudice. The trial court cited *People v. Lamoureux* in its order, and petitioner presents no basis to

---

[8] *People v. Lamoureaux* observed that the safety of the victim and the public are not pertinent to whether a court may vacate a petitioner's murder conviction under former section 1170.95 (current section 1172.6). (*People v. Lamoureaux, supra,* 42 Cal.App.5th at p. 265.) The determination turns instead on whether the original charging document permitted the prosecution to proceed under the felony-murder rule or murder under the natural and probable consequences doctrine, the petitioner was convicted or accepted a plea offer of murder, and the petitioner could not be liable for murder as a result of the legislative amendments to sections 188 and 189. (*Ibid.*)

discount the trial court's express confirmation that it based its decision on the evidence presented, not on the victim impact statements. (Cf. *Solomon v. Superior Court* (1981) 122 Cal.App.3d 532, 537 ["Appellate courts ordinarily presume that a judge is capable of weighing the admissible evidence without being prejudiced by extraneous matters"].)

## DISPOSITION

The order is affirmed.


BROWN, J.


I CONCUR:

NADLER, J.*


*People v. Sifuentes* (A162225)

---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

POLLAK, P.J., Concurring.

This is an extremely close case. Defendant was not in the immediate presence of either the shooter or the victim when the killing occurred. And, as the majority opinion makes clear, what defendant knew or reasonably should have known must be determined as of no later than the point at which the shots were fired. Moreover, as the majority also states, a generalized awareness that police are likely to respond to a crime is not sufficient to establish that a coparticipant in a felony should reasonably know that anyone killed in the course of the offense would be a police officer. Yet, based on the particular and somewhat unusual circumstances that preceded the killing in this case, which the trial court carefully considered and the majority opinion correctly recites, I cannot say that the record lacks sufficient evidence to support the trial court's finding. Whether this finding is consistent with the reasoning that led to the adoption of Penal Code section 189, subdivision (f) in its current form is problematic, however, and may justify further consideration by the Legislature and by the Parole Board when defendant's application comes before it.


POLLAK, P. J.

1

Trial Court:        Alameda County Superior Court

Trial Judge:        Hon. Morris D. Jacobson

Counsel:

Keker, Van Nest & Peters LLP, Nicholas D. Marais, Andrew S. Bruns, Tara M. Rangchi [, under appointment by the Court of Appeal,] for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Jeffrey M. Laurence, Assistant Attorneys General, Seth K. Schalt, Bridget Billeter, Deputy Attorneys General for Plaintiff and Respondent.